THE UNITED STATES, RESPONDENT, v. A. MILTON
MUSSER, APPELLANT.

CRIMINAL LAW—UNLAWFUL COHABITATION—SEXUAL INTERCOURSE.—
Sexual intercourse is not a necessary element in the crime of co-
habiting with more than one woman created by sec. 3 of the Act
of Congress of March 22, 1882; ch. 47, 22 Stat. 31. But such crime
is committed by a man who lives in the same house with two
woman, in the habit and repute of marriage, and holds both of
them out to the world as his wives.

ID.—EVIDENCE.—The evidence stated in the opinion considered and
held sufficient to authorize the verdict.

ID.—COUNSEL STATING FACTS NOT IN EVIDENCE.—In his closing argu-
ment to the jury the district attorney stated that material wit-
nesses had been put out of the way by procurement of the defend-
ant; there was no evidence tending to show this and the court so
stated; the same counsel also asserted in the course of his argu-
ment that an outsider had made signals to the jury during the
trial and the court again checked him; held that defendant was
not prejudiced by these remarks in view of the charge of the
court to the jury that in considering their verdict they should
only consider the evidence and not take into consideration facts
not in evidence.

ID.—EVIDENCE OF CONDUCT PRIOR TO OFFENSE CHARGED.—Defendant
being charged with unlawfully cohabiting with two women
between two stated dates, evidence of his conduct and relation-
ship to the women prior to the first date is admissible as tending
to characterize his conduct to them after said date.

ID.—PRESUMPTION OF INNOCENCE—RELATIONSHIP UNLAWFUL IN INCEP-
TION.—The cohabitation of a man with more than one woman
was unlawful in Utah Territory prior to March 22, 1882, although
there was then no law providing for its punishment. If a rela-
tionship is formed, which, in its inception, is unlawful, it is not
presumed to cease on the enacting of a law providing for its pun-
ishment: aliter, if the relationship be lawful when formed.

ID.—INSTRUCTIONS ASKED IN AGGREGATE—CHARGE OF COURT COVER-
ING THE ENTIRE CASE.—When instructions are asked in the aggre-
gate and there is anything exceptionable in any of them the
whole may be properly refused, or if the charge given by the court
covers the entire case and submits it properly to the jury such
court may refuse to instruct further.

United States v. Cannon ante p.    followed.

APPEAL from a judgment of the district court of the
third district and from an order refusing a new trial.

The facts are stated in the opinion of the court.

*Mr. Arthur Brown,* for appellant.

The remarks made by the district attorney prevented defendant from having a fair trial.

We refer to the following authorities to show: First. That it was a wrong for which we had the right to a new trial. Second. That there is no cure: *People* v. *Wolcott,* 51 Mich. 615: *State* v. *Kring,* 2 Am. Cr. Law Rep. 314; *State* v. *Smith,* 1 Am. Cr. Law Rep. 581; *Ferguson* v. *State,* 1 Am. Cr. Law Rep. 582; *State* v. *Graham,* 17 N. W. R. 192; *Conn.* v. *People,* 11 Tex. App. 400; *Laubach* v. *People,* 12 Tex. App. 590; *Fox* v. *People,* 95 Ills. 78; *Angelo* v. *People,* 96 Ills. 213; *Tucker* v. *Henniker,* 41 N. H. 322.

*Messrs. Bennett, Harkness and Kirkpatrick, Messrs. Sutherland & McBride, and Mr. F. S. Richards* also for appellant.

*Mr. C. S. Varian* for respondent.

ZANE, C. J.:

The defendant was indicted for unlawful cohabitation with Belinda Pratt Musser, May Musser and Annie Segmiller McCullough Musser, to which indictment he pleaded not guilty. The issue was tried by a jury, who found him guilty as charged; a motion for a new trial was overruled and he appealed to this court. On the trial the defendant, by his counsel, alleged errors of law and of fact. The more important of the former was made by the court, it is claimed, in defining the crime of which the defendant was convicted.

The offense is described in the third section of "An act to amend section fifty-three hundred and fifty-two of the revised statutes of the United States, in reference to bigamy and for other purposes," approved March 22, 1882. It is as follows: "If any male person in a territory or other place over which the United States have exclusive jurisdiction, hereafter cohabits with more than one woman, he

shall be deemed guilty of a misdemeanor." The court below held that sexual intercourse was not essential to the crime. In that the defendant insists there was error, that it is a necessary element and must be proven.

The term cohabit as found in the criminal codes of many of the states is coupled with and qualified by the adverbs lewdly, lasciviously, adulterously, or some other equivalent expression. No such word or expression is found in the section under consideration, or in the act of which it is a part. As defined by lexicographers, cohabit means to dwell with or reside together. It may mean residing in the same country, city or neighborhood, or in the same family, or the dwelling together in lawful wedlock-- this would be lawful cohabitation. Or it may mean the dwelling of a man and woman together ostensibly and apparently in wedlock, when in fact or in law no marriage exists, and without proof of adultery or fornication this would be unlawful cohabitation; or it may mean the living together of a man and woman without lawful marriage, in the practice of fornication or adultery—this would be lascivious, lewd or adulterous cohabitation, another species of unlawful cohabitation; in this last case proof of adultery or fornication is necessary to make out the offense. The ideas which accompany the use of the word determine its import. The ideas of country, of family, of marriage, of the appearance of marriage without it, or of adultery, when associated with the term, vary and determine its meaning in each case. The subject to which it is applied contracts or expands its meaning—it is a word of flexible signification.

Cohabitation, as used in a matrimonial sense, means to dwell together as husband and wife. *Foster* v. *Foster*, 4 Eng. Ec. R. 359, was a case of divorce. In the opinion the court used the following language: "Most certainly, what Dr. Harris has said is true, that the duty of matrimonial intercourse cannot be compelled by this court, though matrimonial cohabitation may." The court made a very plain distinction between matrimonial cohabitation and matrimonial intercourse. The same distinction was made in the case of *Nash* v. *Nash*, id., and in *Orm* v. *Orm*, 2 Eng.

Ec. R. 354. In a note to section 777, Bishop on Marriage and Divorce, the author says: "I am not aware that other judges (referring to a remark of Chancellor Walworth) have often employed this word to denote actual sexual intercourse further than may be presumed from the dwelling together in the same house of parties under the claim of being married, or as necessarily implying even an occupancy by the husband and wife of the same bed. The words matrimonial cohabitation have been used in distinction from matrimonial intercourse to signify a living together in the same house without copulation." To the same effect is the case of *Calef* v. *Calef,* 54 Maine 365 and *Yardley's Estate,* 75 Pa., St.,207. *Ohio* v. *Connoway,* Ohio R. Tappan, 90, was a criminal prosecution. In charging the jury the court read the statute defining the crime, which was, "If any married man shall hereafter desert his wife, and live and cohabit with any other woman in a state of adultery, etc.," and remarked, "The defendant must not only have lived and cohabited with this female, but he must have lived and cohabited with her in a state of adultery." In this the court indicated clearly that it did not understand the word cohabit to embrace sexual intercourse when not qualified by some expression showing such an intention. Counsel, in their briefs and arguments, made reference to numerous other cases, but it is found that the most of them interpreted or construed statutes containing qualifying terms.

We are of the opinion that the weight of authority is to the effect that the crime of unlawful cohabitation, as defined in the statute under consideration, is made out without proof of sexual intercourse, and that proof of non-intercourse is not a defense. In the statute but two crimes are defined. The first section defines polygamy; the third unlawful cohabitation; the fourth provides that the offenses may be joined in the same indictment; the fifth makes the fact that a man summoned as a juror is or has been living in the practice of bigamy, polygamy, or unlawful cohabitation, with more than one woman, or the fact that he is, or has been guilty of either offense, or the fact that he believes that either of such offenses is right, a ground

of challenge. And the eighth section disqualifies those persons who are living in the practice of polygamy or unlawful cohabitation from voting or holding office. Cohabitation with more than one woman is essential to the crime. If the law was aimed at adultery, why require the cohabitation to be with more than one woman? If the national legislature had so intended, it would have given some intimation of that intent in the law. It appears plain that the intention was to protect the monogamous marriage by prohibiting all other marriage, either in form or in appearance only, whether evidenced by a ceremony, or by conduct and circumstances alone.

The court should ascertain the intention of the legislature from the words used, when plainly expressed. But when the meaning of the words is obscure and doubtful and the intention of the lawmaker is uncertain, it becomes the duty of the court to resort to rules of construction in order to discern the idea which the language was intended to express. In the use of the rules of construction we are not confined to the uncertain language of the law, but we may take into view the ideas which the legislator associated with the idea that is in dispute. For with them it existed in the legislator's mind, and in the light of those ideas we may grasp the meaning of the law, as the legislator endeavored to express it.

We may assume that the authors of this law had in mind the institution of marriage, because they expressly declared that any man who having a wife marries another, is guilty of a crime, and that any male person who cohabits with more than one woman is guilty of unlawful cohabitation. They had in view the evil effects of such practices. The end of the law was the protection of the monogamous marriage, and the suppression of polygamy and unlawful cohabitation was but a means to that end. It is proper also to take into consideration the conditions as the national legislature anticipated and understood them in which the law was to be applied and enforced. They knew the time had elapsed within which a very large portion of those living in polygamy could be punished for that offense, and that many of these were among the most influential men

in society, being the heads of the church, and that the example of their continuing to live with their plural wives under a claim of divine right, would be a scandal to society and a menace to the lawful marriage; that such examples would be a continuing invitation and apparent justification for their followers either secretly or openly to violate the law. Congress, therefore, forbade plural marriage in appearance only, as well as in form, and by the example of punishment it doubtless intended to eradicate the example of apparent plural marriages as well as the plural marriage in form.

According to the maxims of sound interpretation for use in searching for the intention of the legislature, it is proper to ask, what was the defect and mischief against which the law did not provide, and the true reason of the remedy? And it is the duty of the court at all times to make such construction as shall suppress the mischief and advance the remedy: Potter's Dwarris on Statutes and Constructions, 184. Whether we interpret the terms used according to their legal sense or resort to the rules of construction and construe them in the light of the reason and the purpose of the law and of the conditions in which its authors understood it was to be applied to human conduct, we reach the same conclusion.

The defendant also insists that the evidence before the jury did not prove him guilty. This raises a question of fact; to determine which it is necessary to examine the evidence. Annie M. Sheets, a daughter of defendant by a deceased wife, married and not living at home, testified that she had known the women named in the indictment, Mary Musser, Annie Segmiller McCullough Musser and Belinda Pratt Musser, several years; that Belinda and Mary lived in defendant's house; that the former lived there about one year and a half and moved to the house she now lives in about four months ago; that Annie Segmiller Musser lived in a house on an adjoining lot; that they all three have children who bear the name of Musser living with them; that Belinda has three; two of them bear the name of Musser; that she never heard the younger called any name but Arthur; that there were eight children

in the house, one of them, Blanche Musser, is between two
and three; that Annie Segmiller McCullough Musser has
three children, from five to eight, who go by the name of
Musser; that defendant called them by their given names,
and they addressed him as father; that the defendant, her
father, lived in the same house with Belinda and Mary;
witness did not live there herself but visited; had seen him
at the table with Mary in the house in which Belinda and
Mary lived; that the house had eight rooms on the ground
floor and four on the second, the rooms down stairs con-
nected by doors; Belinda's bedroom was on the west side,
Mary's on the east, defendant's between; from his room
a door opened into Belinda's; between Mary's and his was
another room having doors which opened into theirs; that
the older children slept upstairs and the younger ones
down; that she had heard defendant refer to Mary as wit-
ness' stepmother, and heard Mary's children address him
as father; that she did not know where Arthur is; last saw
him four or five months ago at his mother's house; nor
does she know where Mary is; that the women named in
the indictment have been for several years past recog-
nized and known in the Musser family as defendant's
wives.

Lizzie Lee testified that she was a married daughter of
Annie Segmiller, now known as Annie Segmiller Musser;
that Belinda Pratt Musser and Mary Musser lived in a
house on a lot adjoining her mother; that she knew de-
fendant; that her mother has five children; that she did not
know how old Ross, the younger, is; last saw him between
four and five weeks ago; (when attention was called to her
statement before the grand jury, she said between two and
three years old); that he was not an infant in arms when
she last saw him; that she saw defendant at her mother's
house about a week ago; her mother was not there; has
not seen her for four or five weeks; last saw the child in
her arms; that she had seen defendant at her mother's
four or five weeks ago; that her mother is recognized by
her and her mother's family as defendant's wife; that she
had heard them speak of the children in presence of each
other, though not as his; that her mother's children were

named Musser. Witness has one full brother and one sister; their name is McCullough; she had heard her mother's other children speak to defendant and of him as father; that her mother's maiden name was Segmiller; that she married McCullough, and she now goes by the name of Musser; had seen defendant at her mother's a number of times, in the evening and morning; witness lived beside her mother, and since last August at her house.

Mary Rideout testified that she had seen Mary Musser's children; that the youngest she saw was two or three years old; had not visited her for three years; that she had seen Belinda Musser's child; when she saw it it appeared to be something over a year old; was an infant nursing; it was a nursing infant in arms last winter, three or four months ago; that witness had seen defendant quite lately about the house; that she traveled with Annie Musser, and defendant met her at the carriage; she had her baby with her; this was last summer.

Joseph Warburton testified: Knew Belinda and Mary Musser and the house in which they lived; was at the house; saw defendant there and going to and coming from the house, driving into the barn; that children bought articles at store and defendant paid for them; that most of the children were Mary Musser's; saw defendant walking and doing chores around his premises.

M. F. Ekels testified that prior to the sixteenth of last October, he lived at Mary Musser's about a year and four months, boarding there; that defendant was there at meals; he sat at one end of the table there nearly all the time; that he ate at Belinda's table once; the occassion was a birthday party; defendant was there; that Mary Musser had six children; the youngest is an infant running around, (whether it was a year ago he did not remember), its name is Blanche; that he knows Annie Segmiller McCullough Musser; witness being a school teacher, went to see her about children she was sending to school; one of Belinda's also went, and some of Annie's; all went on the roll by the name of Musser; that Mary Musser paid tuition for all the children who came under the name of Musser.

Defendant offered in evidence three deeds which had been recorded in which he was grantor, bearing date July 21, 1883; Mary Musser was grantee in the first, Belinda Pratt Musser in the second, and Annie Segmiller Musser in the third; that Belinda Musser moved to the house she now lives in last December.

From the foregoing evidence it appears that the women named in the indictment have for years borne his name, and before that they had borne other names; that for more than one year next preceding December last, defendant had lived in the house with Mary Musser and Belinda Musser; that these two women and defendant occupied bed-rooms on the same floor; that a door opened out of defendant's room on the east, directly into Belinda's room, and on the west into a room which opened into Mary's; that he ate a large portion of the time at her table; that the third woman lived in a house on an adjoining lot; that defendant was frequently there; that Mary has six children, the youngest two or three years old, and Belinda three, the youngest two or three years old; that Annie has three children, ages between five and eight years; that these children all bear the name of Musser and have addressed him as father, and that all three of the women are known and reputed in the family to be defendant's wives. It is undeniable in view of the evidence that defendant lived a large portion of the time charged in the indictment, in the same house with two of the women, and all the time in a house adjoining the other woman at whose house he was frequently. What relationship did he bear to these women with whom he was living? Was it the relationship of father and daughter, brother and sister, employer and employee, master and servant? Neither of these questions can be answered in the affirmative in the light of the evidence. The evidence points to but one relationship, and that is matrimonial, husband and wife; the evidence can be reconciled on no other hypothesis. To consider a portion of the evidence apart from the rest is not the right way to determine its sufficiency; a portion may not establish the disputed fact, but all together may prove it beyond a reasonable doubt. A portion of a physical structure

does not prove its existence, but when all the parts are taken together, there can be no room to doubt its existence When all the evidence in this case is so considered, we are of the opinion that it sufficiently appears that defendant, during the time mentioned in the indictment, was living with at least two of the women named, in the apparent relation of marriage; that by his language and conduct and appearances and expressions for which he was responsible, he held them out to the world in that relationship; that he was living with them in the habit and repute of marriage. We are of the opinion that the evidence was sufficient to authorize the verdict found.

Witness Lizzie Lee, who lived at the house of one of the reputed wives and her daughter, stated that she did not know where her mother was, that she last saw her four or five weeks ago. And witness Annie M. Sheets, a daughter of the defendant who visited the house of Mary Musser and defendant frequently, testified that she did not know where Mary was. And the evidence tended to show that two or three of the youngest children had not been seen for some time. And the assistant district attorney, in his closing argument to the jury, said that it was in the power of defendant to show all the facts in defense by his wives and children, but that it was not in the power of the prosecution to do so by them, because they had been put out of the way by the procurement of the defendant. The defendant's counsel objected to this language, and the court said there was no evidence that defendant had put them out of the way, and the assistant district attorney made no further remarks on the point. The bill of exceptions also shows that the same attorney in his argument, stated that an outsider had made signals to the jury during the trial, and the court checked him, and he said nothing further with respect to it. The remarks were made in the heat of argument, and the attorney did not persist, but ceased as soon as his attention was called to the impropriety. The court charged the jury that in considering the verdict, they should not go outside of the evidence and take into consideration facts not in evidence, that they should consider only evidence, and

consider it fairly.   In support of this assignment of error
counsel for defendant cite a number of authorities.   In
some of them the trial court had permitted the prosecut-
ing attorney to continue over the objection of defendant.
In other cases the remarks of the state's attorney were in
violation of a statute forbidding comment on the fact that
defendant had not testified when the law permitted him to
do so.   In each of the cases cited there had been an
aggravated breach of professional duty and obligation to
the injury of the defendant.   In view of the circumstances
attending the statements of the assistant district attorney
and of the fact that he ceased further remarks as soon as
his attention was called to the impropriety, and of the
charge of the court, and of the authorities, we are of the
opinion that this exception is not well taken.

The indictment charges that the defendant unlawfully
cohabited with the women therein named, between the
first day of May, 1882, and the first day of April, 1885.
And the defendant insists that it was error to admit evi-
dence of defendant's conduct and of his relationship to
them before the day first mentioned.   The offense of the
defendant consisted in dwelling with the women in the
habit and repute of marriage, holding that relationship
out to the world by his language and conduct or by expres-
sions and conduct for which he was responsible; that he
lived in the house with two of them during the time men-
tioned, there is no room for controversy.   And the ques-
tion is, What relationship existed between the defendant
and these women?   Was defendant there as a guest? As a
boarder?   Was he the proprietor of the house and the
women in his employ as servants—chambermaids or cooks?
Were they his sisters?   Was any of them his mother?
Or were they there as his wives?   Does not his conduct
before the offense charged throw light upon the inquiry?
Evidence of the feelings and intent of the defendant with
respect to the crime and towards the injured party is com-
petent in cases of murder and other crimes which may be
committed by a single act.   It would appear to be more
pertinent when the offense consists of a succession of acts
and expressions extending through a considerable period

and indicating the relationship of marriage. That relation is usually preceded and attended by affections and feelings peculiar to it, and more permanent in their charater, and they give rise to conduct indicating their existence and thereby indicating marriage. Evidence that defendant had married the women—had been living with them as his wives before the offense—adds weight to the circumstances pointing to unlawful cohabitation during the time in which the offense is charged.

It is further insisted that the court erred in admitting evidence tending to show marriage to the women named before the law which the defendant is charged with violating took effect, and that the court erred in refusing to charge the jury that the law presumed the defendant ceased to cohabit with his wives when the law took effect. The court did charge that the law presumed the defendant innocent till proved guilty beyond reasonable doubt—innocent both before and after the law was in force—before and at the time of the offense charged.

If a lawful relationship is formed, and its continuance is made unlawful, the law presumes the parties thereto intend to obey the law, and that they terminate or change the relationship so as to make it conform to an innocent intent. In such a case it is necessary that the lawful intent should be changed to an unlawful one, or that the relation should be changed to a lawful one, that is to say, made to conform to the law; the law presumes change of conduct rather than change of a lawful intent to an unlawful one. But if the relationship was unlawful in its inception, and the intention was unlawful, then it would be necessary to presume a change of both intention and relationship. If the relationship was unlawful in the beginning, and the intent was also, and the name of the offense is simply changed, or punishment is simply imposed on that which was unlawful before, the presumption remains the same as though no change had been made in the law. In either case the law presumes innocence till guilt is proven. A disposition and intention to violate the law in entering into the relationship with these women being shown, it affords an inference of some effect upon the

mind when considered with the other evidence at the time
of the offense charged. The inference against the defend-
ant from his marriage to these women before the law went
into force with the inferences from his own conduct to-
wards them, and the circumstances within the time limited
in the indictment strengthens the latter. In determining
how this man lived between the dates named, the public
would take into view his inclination and disposition to co-
habit with the women as shown by his conduct and ex-
ample before the law took effect, because in that way his
mode of life contributes to the example which injures so-
ciety. The common law has been in force in this territory
more than a generation. And an act of Congress against
bigamy more than twenty-two years. None of the conduct
or circumstances in evidence extend back so far. They
tended to prove a relationship unlawful in its inception.
We are of the opinion that there was no error in admit-
ting evidence for the purpose of showing marriage be-
tween the defendant and the women named, before the
law took effect, or showing that he cohabited with them as
his wives before that time: *Thayer* v. *Thayer*, 101 Mass., 111.

Exceptions were also taken to the charge of the court to
the jury, and to the refusal of requests to charge by the
defendant. The entire charge of the court, as given to
the jury, is set out in the bill of exceptions. It contains a
description of the offense and the plea of the defendant,
and charges them that the law presumes the defendant in-
nocent till proven guilty beyond a reasonable doubt; that
if the jury believe beyond a reasonable doubt that at the
county and between the dates mentioned in the indictment,
the defendant lived with the women therein named, or
with any two of them as his wives in the habit and repute
of marriage, they should find him guilty; that it was not
essential that sexual intercourse should be shown or a mar-
riage celebrated; that the jury were the sole judges of the
credibility of the witnesses, of the weight of the evidence
and of the fact; that in judging of their credibility the
jury might take into consideration the deportment of the
witnesses on the stand, their apparent frankness and can-
dor, or the want thereof, appearing from the evidence—

the reasonableness of their statements, and any fact appearing in evidence affecting their credibility; that in weighing the evidence the jury should consider it altogether, and should consider only evidence, that they should not go outside of it; that they should consider it fairly and candidly, and reach such reasonable conclusions as they might be able. The jury found the defendant guilty as charged.

The prosecution asked no instructions and the defendant asked twenty-five—all of which were refused, except so far as their principles were contained in the charge given.

In the case of the *Indianapolis, etc., R. R. Co.* v. *Horst,* 93 U. S. 291, the court said: "It is the settled law in this court that if the charge given by the court below covers the entire case and submits it properly to the jury, such court may refuse to instruct further. It may use its own language, and present the case in its own way." The charge of the trial court in this case covers the entire case and is plain. In the case last cited the court also said: "When instructions are asked in the aggregate, as were those of the defendant, and there is anything exceptionable in either of them, the whole may be properly refused by the court. That there were many things exceptionable in the twenty-five asked in the case under consideration is certain. The instructions asked and refused, so far as we deem it necessary to refer to them, may be classified as follows: First—Those stating abstract principles of law. In the refusal of these there can be no error. Second—Such as attempted to define the degree of intimacy necessary to be shown between defendant and the women named. In its charge to the jury the court gave a definition of unlawful cohabitation, and in doing so defined the necessary intimacy. Third—Those relating to the presumption of innocence arising when the law under which defendant was prosecuted took effect. The question raised by the exception was discussed above, and we are of the opinion that the exception is not well taken. Fourth—Those declaring principles of law included in the charge. The court stated such principles in its own language in the charge, and that was sufficient.

The precise questions raised by the exceptions to the ruling of the court below in this case in refusing to sustain objections to the indictment were considered in the case of the *United States* v. *Cannon, ante,* p. 122, and decided at the present term.    We are satisfied with the conclusions reached in that case,' and hold that the trial court committed no error in overruling such objections.    Without directing attention further to the exceptions taken by defendant, and after a careful consideration of the whole case, we are of the opinion they are not well taken, and that the judgment of the court below should be affirmed.

It is so ordered.

BOREMAN, J., concurred.

POWERS, J., concurs in that portion of the opinion construing the Edmunds act, but dissents from the conclusion of the court affirming the judgment of the court below, and files his reasons therefor.

POWERS, J., dissenting:    This case was argued at the same time as the case of the *United States* v. *Angus M. Cannon,* and many of the objections that are here raised were discussed in the latter case, and are considered and determined in the opinions filed.    It is, therefore, unnecessary to refer to the question raised as to the proper construction of the Edmunds act, so called.    There are, however, some features entirely different and distinct, raised by the record in this case, from those that were raised and decided in the Cannon case, and while my brethren are of the opinion that there is no error shown in the record, I am so clearly of the opposite opinion, and so well convinced that a new trial should be ordered, that I dissent from the opinion of the court, and present herewith my views:

1. The first point that is raised by the defendant is that there was not sufficient evidence to justify the verdict of the jury for the offense as defined by the court.

While a careful reading of the record discloses that the testimony was somewhat weak, still I am not prepared to say that the case should have been taken from the jury,

and, indeed, in the view that I take of the case, and with the manifest errors that the record discloses, it is not necessary that I should determine that question. I may, however, in passing, refer to one matter. It is contended by the defendant that his entire conduct towards the women designated as his wives, as shown in the testimony, was not only proper, but commendable. It is argued that as he had previously had children by these women, and that these children had been legitimated by the very act which makes it a misdemeanor for a male person to cohabit with two or more women, the defendant was under a moral obligation, if not legally compelled so to do, to support his children and their mothers. That he, therefore, had a right to live with them under the same roof, to eat with them at the same table, to confer with them and to converse with them; to call them by his name, and to treat them in as friendly a manner as he chose, so long as he refrained from sexual intercourse with the women.

The defendant claims that there is no law that requires him to divorce himself from the women. That is true, but the effect of the Edmunds Act is to require him to treat these women substantially as he would be required to treat them if he had been divorced from them by a court of competent jurisdiction. In my opinion, a man who has heretofore contracted a polygamous marriage, and has had children by two or more women, is required, as I have stated, to treat those women precisely as he would be required to treat them if he had been divorced from them. A man divorced from a woman is under legal obligations to support his children; he may be required by the decree of the court to support his wife, and to pay to her stated sums at stated intervals, but, with the exception of the business relations which exist between him and his former wife, it is not expected that he will have any further intimacy with her. He may visit his children, he may make directions with regard to their welfare, he may meet his former wife on terms of social equality, but it is not expected, after the decree of divorce, that he will associate with his former wife as a husband associates with his wife, that he will live under the same roof, and, to outward ap-

pearances, live with her as a husband lives with his wife. The Edmunds law says that there must be an end, and it puts an end, to the relationship previously existing between polygamists, whatever it was. It says that the relationship must cease.

2. On the trial of this case, Bishop Warburton, of the Mormon church, and Charles Brown were sworn as witnesses for the prosecution. Brown is the ward clerk, and he testified that there is a record book kept in his ward, which is in the same ward in which Musser lived, of the births, baptisms and blessings of children. He stated that as clerk of the ward it is a part of his duties to keep such book, and he is its custodian. From his testimony it appeared that about six months previous to the trial, the book mysteriously disappeared. The witness stated that he did not know where it was, that he had made efforts to find it, and that he had been unable to find it. He stated that the book contains, in addition to the record of baptisms, the names of the child and its parents. Bishop Warburton testified that he did not know where the book was, or by whom it had been taken, and stated that he never had blessed any of defendant's children. The question was put to Brown, after he had testified that the book had been taken from his custody, as follows: "By whom was it taken?" And defendant objected, on the ground that the testimony was immaterial; the court overruled the objection and the defendant excepted, and the witness testified that he did not know. The defendant also objected, on the ground that the testimony was immaterial and irrelevant, to the testimony of Bishop Warburton as to his administering blessings to children, and an exception was taken to the admission of the testimony.

This testimony was all clearly immaterial and irrelevant, and should have been stricken out by the court, and the jury instructed not to consider it. True, there is very little in it that may be said to directly injure the defendant, but in its very immateriality the danger lies. It tended to distract the attention of the jury from the real issue, and would have a natural tendency, by leading their minds from the question as to whether the defendant was guilty

of cohabitation, to consider the peculiarities of the Mormon church organization. There was also danger that the jury might infer that the defendant was in some way connected with the loss of the book inquired after, when there was no proof on that point. But as the record discloses that the defendant did not see fit to avail himself of his right to move to strike out the testimony, and did not object to many portions of it that were clearly inadmissible, it, therefore, is not necessary to further consider this testimony at this point, and it is only mentioned at this time on account of the bearing that it will be seen to have on this case, when we come to consider some further developments in it, and also the charge of the court and the requests for instructions that were presented by the defendant.

3. The next point that is made by the defendant is of more importance. After the evidence had been closed, the assistant district attorney, in making the closing argument for the prosecution, stated to the jury, in substance, that it was within the power of the defendant to show all the facts in his defence, by his wives and children, but that it was not in the power of the prosecution to show the facts by them, because they had been put out of the way by the procurement of the defendant. One of the counsel for the defendant objected to this line of argument, and the court thereupon remarked, "I suppose there is no evidence as to how they were put out of the way?" All the testimony taken in this case before the jury is brought up by the record, and it discloses that there was no evidence, but that the persons referred to had not been put out of the way by the procurement of the defendant, or by anybody else, and the court was therefore in error when it said, "I suppose there is no evidence as to *how* they were put out of the way," because that remark could not have failed to convince the jury that it was clearly the opinion of the court, that the persons referred to had been put out of the way somehow, and instead of curing the error caused by the remarks of the district attorney outside of the record, it added additional error, and gives additional ground to the defendant upon which to base his claim for a new trial. A

judge has no right to express his opinion upon the facts of the case in the hearing of the jury, in a manner that will have a tendency to affect their verdict. The rule is laid down in many well considered cases, that it is not proper for the judge to make remarks in the hearing of the jury, calculated to influence their finding: *Kelly* v. *Borland,* 78 Ill., 438; *Furham* v. *Huntsville,* 54 Ala., 263; *Wannack* v. *Mayer,* 53 Ga., 162; *Hasbrouk* v. *Milwaukee,* 21 Wis., 217: *Cronkhite* v. *Dickerson,* 51 Mich.

It appears by the record that after the judge had made the remark that I have quoted, the district attorney made no further comment on that subject. It also appears that at another part of his argument he stated to the jury that during the trial of the case an outsider had come into the court-room and made signals with his fingers, as a means of telegraphing to the jury. The defendant's counsel interrupted him and called him to order, upon which the court said: "that can be attended to afterward," and thereupon the district attorney ceased to comment upon it. The prosecution contends that the remarks referred to were made in the heat of argument, without any thought of traveling outside the record, and with no purpose or intent to mislead the jury in their consideration of the case. The prosecution submits that the improprieties complained of were inadvertant; that they were not the result of mature deliberation, and that they were not continued. All of which I am glad to concede, but the fact that the remarks were inadvertently made, would not remove their natural effect upon the jury. The prosecuting officer, representing and standing for the government, by reason of the very position that he occupies, has more weight and influence with the jury than private counsel. He is supposed to have no more interest in the case, than that justice may be done between the government and the prisoner at the bar. He is supposed to be impartial in his investigation of crime, and in his efforts to suppress it. Upon the one hand, he is not to let any guilty man escape; upon the other hand, he is not to allow any innocent man to be convicted. On this account, his words to the jury being presumed by the law, and by the people, for that matter,

to emanate from an unprejudiced and unbiased mind, his statements have infinitely more weight, and his remarks should, therefore, be more guarded than those of an attorney who appears in behalf of the defendant. A prosecuting attorney is not a plaintiff's attorney, but a sworn minister of justice; as much bound to protect the innocent as to pursue the guilty: *Wellar* v. *People*, 30 Mich., 23.

His position is one involving a duty of impartiality, not altogether unlike that of the judge himself. The position is a trying one, but the duty, however, exists: *Meisler* v. *People*, 31 Mich., 104.

He represents the public interests, which can never be promoted by the conviction of the innocent. His object, like that of the court, should be simple justice, and he has no right to sacrifice these to any pride of professional success, and however strong may be his belief in the prisoner's guilt, he must remember that though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so attained, is unjust and dangerous to the whole community; *Hurd* v. *People*, 25 Mich., 416.

That the remarks of the assistant district attorney were calculated to work injury to defendant and were error, I do not think can be successfully denied. But it is argued that no exception was taken at any time, that there was nothing to except to, that the court was asked to interfere and did so, and that thus the application of the defendant was granted, and that the matter has no place in the record and cannot be considered by the court. It would seem to be too clear for argument that the matter is subject to review by the supreme court. The supreme court has supervisory jurisdiction over the district courts, and whenever it appears that a defendant has not had a fair trial, or that the trial has not been conducted in accordance with the settled rules of law, this court has the power to review the proceedings and to order a new trial. There are many cases in the books in which it has been held that points similar to the one under consideration would be considered by an appellate court. See *Scripps* v. *Reilly*, 35 Mich., 391, and cases there cited. It has been many times ruled

that counsel, in argument, must not seek to influence the jurors by reference to the matters in the nature of evidence not in proof before them, and that the trial judge should promptly repress the attempt as something reprehensible: *Bullock* v. *Smith*, 15 Ga., 395; *Scripps* v. *Reilly*, 35 Mich., 391; *Berry* v. *State*, 10 Ga., 511; *Mitchum* v. *State*, 11 Ga., 615; *Dickerson* v. *Burke*, 25 Ga., 225; *Read* v. *State*, 2 Ind., 438; *Tucker* v. *Henniker*, 41 N. H., 317; *Kennedy* v. *People*, 40 Ill., 488; *Hutch* v. *State*, 8 Tex. Ct. App., 417; *Austin* v. *People*, 102 Ill., 264; *Fox* v. *People*, 95 Ill., 78; *Angelo* v. *People*, 96 Ill., 213; *Conn* v. *People*, 11 Tex. Ct. Ap., 400; *Lanbach* v. *People*, 12 Tex. Ct. App., 590; *State* v. *Kring*, 2 Am. Crim. Law Rep., 314; *State* v. *Smith*, 1 Am. Crim. Law Rep., 581; *Ferguson* v. *State*, 1 Am. Crim. Law Rep., 582; *Slade* v. *Graham*, 17 N. W. Rep., 192.

It has been held that where counsel have traveled outside of the record in addressing the jury, that the error was not cured even by an instruction to the jury not to consider the matter: *Morton* v. *Ordnorf*, 22 Iowa, 504; *State* v. *Whit*, 5 Jones, N. C., 224.

It is the chief duty of the trial judge to secure fair play to litigants, and, so far as practicable, to shape the order and course of the proceedings in such a way, that neither party will be put to a disadvantage not due to his case or its mode of management by his counsel. The rules of the court, and what is called the course of the court, have their origin in the purpose to secure fairness in legal controversies, and the order of business and the regulated succession of steps at trials have the same object. The courts have usually been very firm in confining counsel within proper bounds and guarding jurors against unfair and irregular acts and endeavors, and parties have been deprived of their verdicts upon evidence merely indicating the operation of influences about the outskirts of the trial: *Scripps* v. *Reilly*, 35 Mich. 390.

It was stated in *Tucker* v. *Henniker*, 41 N. H. 322, that it would be utterly vain and quite useless to caution jurors in the progress of a trial against listening to conversations out of the court room in regard to the merits of the case,

if they are permitted to listen in the jury box to statements of facts not in evidence calculated to have a bearing upon their judgment, enforced and illustrated by all the eloquence and ability of learned, zealous and interested counsel.

Considering in connection with the remarks of the prosecuting attorney complained of, the fact of the weakness of the testimony, the immaterial evidence received from the witnesses Brown and Warburton, and the remarks of the court upon the objection made to the line of argument of the district attorney, I am forced to the opinion without going any further that there is error in the record, and that a new trial should be granted without any hesitation. It may be that this defendant should be convicted, but the fact that he should be convicted, if such is the fact, does not deprive him of his right to a fair trial according to the law and the evidence.

4. The trial having taken the course that I have indicated, it became the duty of the court, when it came to charge the jury, to very carefully guard the rights of the defendant, and to clearly draw the attention of the jury to the real issue in the case, and inform them that outside matters and irrelevant testimony should not be considered by them. The testimony proper for their consideration should have been pointed out, and the matters and testimony that the jury ought not to consider should also have been called to their attention, but the charge of the court fails to do this. The attempt made to cure the errors that I have indicated was not sufficient. Each and every instruction requested by the defendant is refused, many of them being clearly proper, some being calculated in a slight degree to cause the jury to disregard the matters that had been improperly brought to their attention. The charge simply states the offense, tells the jury that it is brought under a section of the statute of the United States, which is read to them; that the defendant is presumed innocent until proven guilty beyond a reasonable doubt, and that if the jury believe from the evidence, beyond a reasonable doubt, that the defendant, between the dates named in the indictment, lived with the women named therein, or

with any two of them, as his wives, in the habit and repute of marriage, they should find him guilty; that they need not find that he lived with any one of them, or any two of them, all the time, but he must live with them a portion of the time within the dates charged; that it is not necessary to the offense that the defendant should occupy the same bed with the women, or have sexual intercourse with them; neither is it required that a marriage should be celebrated between any of them and the defendant. The jury were told that they must consider the evidence all together, and not go outside of it. They were told that they were the sole judges of the credibility of the witnesses and the weight of the evidence; that they must consider it all together, not giving undue weight to any portion of it; and, in conclusion, they were told that a reasonable doubt is a doubt based upon reason—based on the evidence or the lack of evidence.

Nothing was directly said to the jury with reference to the remarks of the district attorney, or with regard to immaterial evidence introduced in the case. The testimony had a very wide range, extending back for many years prior to the passage of the Edmunds act, and the defendant requested the judge to charge the jury that "the law distinguishes between the continuing of the status of a polygamous marriage and cohabitation between the parties. The former is not unlawful, and its continuance affords no ground for inference of the fact of cohabitation. It is not necessary that the parties to a polygamous marriage should divorce themselves in some effectual way, in order to entitle themselves to the presumption of innocence of the offense of cohabitation." There can be no question but that this instruction is proper, and should have been given, and its refusal was error. That it was proper is readily seen by an examination of the case of *Murphy* v. *Ramsey*, 114 U. S. 15.

The defendant also asked the court to instruct the jury that "there is no duty on the defendant to produce in court his children, or the women mentioned in the indictment; nor is there any evidence that the defendant has had any agency in keeping them away, or in preventing the service

of subpœna on them, and the jury are not authorized to draw any inference against the defendant from their absence." This request is proper, and should have been given. The only reason that I can conceive for its refusal and the failure of the court to say anything upon this subject in his charge, after the matters had arisen upon the trial, and in the course of the argument to which I have referred, is that the judge must have believed that the jury were entitled to draw an inference against the defendant on account of the absence of those parties. After the court had given this charge, one of the counsel for defendant called the attention of the judge to the fact, that it had been argued to the jury that there is no presumption of law, that on the passage of the Edmunds act, those who had lived in polygamy before ceased to do so, and the defendant's counsel called the attention of the court to the fact that at the time of the argument the court did not correct the prosecuting attorney, and requested a charge upon this point, to which the court replied, "I did not wish to charge upon this point; I have charged the jury that the law presumes the defendant innocent."

The instruction requested by the defendant's counsel should have been given, and in not giving it the court virtually allowed the jury to believe that there is no presumption of law that at the passage of the Edmunds act, those who had lived in polygamy before ceased to do so. In my opinion, such is the presumption of law. The court was also requested to instruct the jury that evidence of anything that transpired between the parties—the defendant and his alleged wives—or their relationship between each other, prior to the date named in the indictment, is immaterial, except for the purpose of illustrating their conduct afterwards. The request should have been given, and so ought the jury to have been instructed, as requested by the defendant, that "Evidence has been introduced tending to show the keeping of a record of baptisms and blessings by the clerk of the ward in which the defendant lived. That evidence could only be material for the purpose of showing that the defendant had nominated some of his children for either of those rites, and if the jury find that

this defendant did not have the names of any of his children entered in that book, then that entire testimony becomes immaterial."

I have already called attention in the opinion filed in the Cannon case, to the various requests for instructions, which were made in that case and refused by the court. The same requests were made in this case and refused by the court. The refusal was error. The error is more apparent in this case, the testimony being less substantial than that of the case of the *United States* v. *Cannon*.

For the errors that I have pointed out as well as on account of many others apparent upon the record, I dissent from the opinion of the majority of this court, and I believe that the defendant Musser should have a new trial granted him, because the record discloses that the trial which resulted in his conviction was not a fair trial.