## STATE v. BARLOW et al.

Nos. 6737-6751. Decided December 1, 1944. (153 P. 2d 647.)

Certiorari dismissed by U. S. Supreme Court.

See 22 C. J. S. Criminal Law, Sec. 24; (9) 24 A. L. R. 1237; 7 Am. Jur. 766.

*Claude T. Barnes, J. H. McKnight, Knox Patterson,* and *Edwin D. Hatch,* all of Salt Lake City, for appellants.

*Grover A. Giles,* Atty Gen., *Brigham E. Roberts,* of Salt Lake City, and *W. Stanford Wagstaff,* Asst. Atty. Gen., for respondent.

McDONOUGH, Justice.

These cases all involve the same legal questions and, in substance, the same facts. They are consolidated for purposes of appeal.

Each of the defendants was charged with and convicted of the crime of unlawful cohabitation in violation of Sec. 103-51-2, U. C. A. 1943, which statute is a companion statute to Sec. 103-51-1, which prohibits the practice of polygamy. The trial in each case was based on a stipulation of facts tendered by each defendant and adopted by the district attorney.

Sec. 103-51-2, supra, reads:

"If any person cohabits with more than one person of the opposite sex, such person is guilty of a felony.

"Any person, except the defendant, may be compelled to testify in a prosecution for unlawful cohabitation; provided, however, that the evidence given in such prosecution shall not be used against him in any proceeding, civil or criminal, except for perjury in giving such testimony. A person so testifying shall not thereafter be liable to indictment, prosecution, or punishment for the offense concerning which such testimony was given."

One of the stipulations referred to—and they are all identical except for names and the dates when the acts were committed—is as follows:

"That the said Albert Edmund Barlow on and between October 14, 1941, and the 1st day of March, A. D. 1944, at the County of Salt Lake, State of Utah, did cohabit with more than one person of the opposite sex, to wit: With Amanda Kate Kilgrow, Vio Frazer, Marine Owen; and that said association was based on the belief of the said defendant and the women in the divinity of the Doctrine of the Covenants of the Church of Jesus Christ of Latter-day Saints (exclusive of the Manifesto). No testimony was offered concerning sexual intercourse of the defendant with said women."

On each separate appeal the same various errors are specified. The principal contentions and arguments of appellants are in substance that: (1) The statute, the information and the stipulation each fail to state the commission of any public offense, for the word "cohabit" is not defined, and nothing more than innocent association can be inferred. (2) The prosecution and conviction of each defendant constitutes a violation of the rights of religious

freedom guaranteed by the First and Fourteenth Amendments to our Federal Constitution, and also by the Treaty of Guadalupe Hidalgo of 1848, 9 Stat. 922. (3) The stipulation of facts shows that the conduct of each defendant was based upon belief in the "Doctrine and Covenants" (exclusive of the Manifesto) of the Church of Jesus Christ of Latter-day Saints, and that there was therefore no criminal intent. (4) The inclusion of the "irrevocable ordinance" in Article III of the Constitution of Utah, whereby the practice of polygamy is prohibited, was the result of coercion by Congress and that said provision together with all legislation enacted thereunder was and is null and void. (5) The statute is unconstitutional in that more than one subject was included in the bill and that its subject is not clearly expressed in its title. (6) The statute is special legislation and therefore void.

A brief review of a phase of the history of Utah and of some of the factors which brought about the legislation assailed should be of aid in the consideration of the contentions of defendants. The people of the Church of Jesus Christ of Latter-day Saints (for convenience called the "Mormon Church" hereinafter or the "church") came to this area to escape persecution. Belief in what those people claimed to be divine revelations to Joseph Smith as a prophet, contained in part in the "Doctrine and Covenants," aroused a great deal of opposition. Section 132 of said Doctrine and Covenants as now published, is what is known as the "revelation on eternal marriage"; and in connection therewith appears the doctrine of "plural marriage," whereby a man might marry more than one woman if he obtained the consent of his wife and permission of the presiding officials of the church.

Whether or not such permissions were prerequisite to valid plural marriage in the eyes of the church, and whether appellants otherwise interpret the doctrine, we are not here concerned. We mention such condition because of their bearing on the meaning and effect of the "Manifesto," hereinafter mentioned. In any event, the practice of polyg-

amy among adherents of the Mormon faith in this territory was attacked not only by the non-Mormons of the region but by diverse groups elsewhere in this country. Agitation was widespread to bring about its suppression by law.

As a result Congress in 1862 enacted what became known as Sec. 5352, Rev. Stat. U. S. (12 Stat. 501, 18 U. S. C. A. § 513):

"Every person having a husband or wife living, who marries another, whether married or single, in a Territory, or other place over which the United States have exclusive jurisdiction, is guilty of bigamy, and shall be punished by a fine of not more than five hundred dollars, and by imprisonment for a term of not more than five years."

After some years of delay, some executive measures were adopted for the enforcement of this act in the territories. In *Reynolds* v. *United States,* 98 U. S. 145, 161, 25 L. Ed. 244, the defendant who was convicted under the foregoing statute proved "that he had received permission from the recognized authorities in said church to enter into polygamous marriage," and he contended that he believed it was his religious duty to practice polygamy and that he was therefore protected in such practice by the First Amendment to our Federal Constitution. His contention was rejected and his conviction affirmed. However, the United States Supreme Court in its opinion did not discuss the question of whether the act did or could relate to those who entered into polygamy prior to the enactment of the statute.

On March 22, 1882, the statute was amended, and there was added among other provisions, the following section prohibiting "unlawful cohabitation," 22 Stat. 31:

"Sec. 3. That if any male person, in a Territory or other place over which the United States have exclusive jurisdiction, hereafter cohabits with more than one woman, he shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than three hundred dollars, or by imprisonment for not more than six months, or by both said punishments, in the discretion of the court."

Congress made it clear in 1887 when a proposed constitution for the State of Utah was submitted by the people here, that statehood would not be granted without some unequivocal constitutional provision prohibiting plural marriage. The proposed Constitution of 1887 prohibited polygamy, making its practice a misdemeanor. Various public officials urged church leaders to renounce sanction for plural marriage, but the church officials were evidently reluctant to entertain such counsel until the constitutionality of the measures enacted to stamp out polygamy had been thoroughly tested. On September 25, 1890, four months after *Late Corporation of Church of Jesus Christ of Latter-Day Saints* v. *United States*, 136 U. S. 1, 10 S. Ct. 792, 34 L. Ed. 478, was decided, Wilford Woodruff, then president of the church, issued an "Official Declaration" commonly known as the "Manifesto," which declaration was approved by his associate counsellors and apostles. In that declaration it is stated:

"We are not teaching polygamy or plural marriage, nor permitting any person to enter into its practice.   *   *   *

"Inasmuch as laws have been enacted by Congress forbidding plural marriages, which laws have been pronounced constitutional by the court of last resort, I hereby declare my intention to submit to those laws, and to use my influence with the members of the church over which I preside to have them do likewise.

"*   *   *   And I now publicly declare that my advice to the Latter-day Saints is to refrain from contracting any marriage forbidden by the law of the land.

"Wilford Woodruff

"President of the Church of Jesus Christ of Latter-day Saints."

At a general conference of the church held on October 6, 1890, the following resolution presented by Lorenzo Snow, one of the twelve apostles of the church, was unanimously adopted by vote of the conference:

"I move that, recognizing Wilford Woodruff as the president of the Church of Jesus Christ of Latter-day Saints, and the only man on the earth at the present time who holds the keys of the sealing ordinances, we consider him fully authorized by virtue of his posi-

tion to issue the Manifesto which has been read in our hearing, and which is dated September 24th, 1890, and that as a church in general conference assembled, we accept his declaration concerning plural marriages as authoritative and binding."

On July 16, 1894, Congress passed the Enabling Act, 28 Stat. 107, requiring thereby, the inclusion in the State Constitution of the so-called "Irrevocable Ordinance" which forever prohibits polygamous marriages. Such ordinance reads:

"The following ordinance shall be irrevocable without the consent of the United States and the people of this State:

"First:—Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited." Const. Art. III.

After the adoption of the Manifesto in 1890, steps were taken to enact in the Territory of Utah legislation similar in scope to the federal legislation. Over two years prior to the passage of the Enabling Act, the Territorial Legislature on February 4, 1892, enacted the following statute on unlawful cohabitation which remained substantially unchanged until 1935:

"If any male person, hereafter cohabits with more than one woman, he shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than three hundred dollars, or by imprisonment in the county jail for not more than six months, or by both said punishments, in the discretion of the court." Laws 1892, c. 7, § 2.

On January 4, 1896, Utah became a state. The language of the 1892 territorial statute became a law of the State of Utah (Article XXIV, Sec. 2, Constitution of Utah) and said statute became Sec. 4209 of R. S. U. 1898, without any alteration in the meaning; and the same was continued in the various compilations and codes until incorporated into Sec. 103-51-2, R. S. U. 1933, in language almost identical

with the original enactment in 1892. By Chap. 112, Laws of Utah, 1935, the latter statute was amended to read as hereinabove first set out.

With the foregoing as a background, we proceed to consider the contentions of appellants in the order in which they are stated hereinabove. The first has to do with the meaning of the word "cohabit" as used in the statute, the information and the stipulation.

Subsequent to the enactment by Congress in 1882 of the statute making unlawful cohabitation a penal offense in territory within the exclusive jurisdiction of the United States, prosecutions and convictions followed in many cases in the Territory of Utah, a number of which reached the Territorial Supreme Court, among them *United States* v. *Cannon,* 4 Utah 122, 7 P. 369, and *United States* v. *Musser,* 4 Utah 153, 7 P. 389. The Cannon case was appealed to the United States Supreme Court. The decision in that court construed the statute, giving to the word "cohabit" therein the same meaning ascribed it by the territorial court. *Cannon* v. *United States,* 116 U. S. 55, 6 S. Ct. 278, 29 L. Ed. 561. However, in *Cannon* v. *United States,* 118 U. S. 355, 6 S. Ct. 1064, 29 L. Ed. 561, the United States Supreme Court having decided in *Snow* v. *United States,* 118 U. S. 346, 6 S. Ct. 1059, 30 L. Ed. 207, that the court was without jurisdiction of the writ of error in such case set aside its decision theretofore rendered in the Cannon case. However, the dismissal of the writ in the United States Supreme Court left the decision of the Territorial Court unimpaired. Furthermore, the definition of the word "cohabit" given in that case is but the dictionary definition. The present Webster's International unabridged dictionary gives the following definition of "cohabit": "1. To dwell or abide in company. Archaic. 2. To dwell or live together as husband and wife * * *." For more than 60 years the word "cohabit" as used in the statutes has had the ordinary common meaning—to live together as husband and wife. When Congress adopted the statute above cited, it palpably did not have in mind the archaic definition applicable to some

ancient literature or poetry, but the modern definition and meaning of the word. See cases cited in 7 Words and Phrases, Perm. Ed. p. 554, et seq. Too, the observations made by the United States Supreme Court in construing the statute, while not authoritative as case law, are here pertinent:

"The word is never used in its first [archaic] meaning in a criminal statute; and its second meaning is that to which its use in this statute has relation. The context in which it is found, and the manifest evils which gave rise to the special enactments in regard to 'cohabitation,' require that the word should have the meaning which we have assigned to it. Bigamy and polygamy might fail of proof for want of direct evidence of any marriage; but cohabitation with more than one woman, in the sense proved in this case, was susceptible of the proof here given; and it was such offense as was here proved that section 3 of the act was intended to reach,—the exhibition of all the indicia of a marriage, a household, and a family, twice repeated." 116 U. S. at pages 74, 75, 6 S. Ct. at pages 288, 289, 29 L. Ed. 561.

In light of the foregoing, the contentions of appellants that the statute is so uncertain as to be meaningless and that the information charges no crime, cannot be sustained.

But appellants assert that though the information in each instance be held not uncertain in meaning because of the use of the word "cohabit" without adding the phrase "as man and wife" nevertheless it should be held fatally defective by reason of failure to supply sufficient facts. Appellants rely on State v. Jessup, 98 Utah 482, 100 P. 2d 969, 971. The prosecution in the Jessup case was under the 1935 amendment, and it is true that we held that the information was defective for failure to allege the names of the person with whom the offense of unlawful cohabitation was allegedly committed. The information in that case merely charged that the defendant "did cohabit with more than one person of the opposite sex," without naming anyone. Assuming that what we said in that case was not modified by our decisions with respect to the sufficiency of an information in State v. Anderson, 100 Utah 468, 116 P. 2d 398, and State v. Hill, 100 Utah 456,

116 P. 2d 392, the defect complained of in the Jessup case does not appear in any of these cases now before us; for in each information the district attorney specifically named the women with whom the State alleged defendant had unlawfully cohabited during the period specified. The information in each of these cases sufficiently states the offense of unlawful cohabitation.

The assault upon the judgment of conviction based upon the contention that the stipulation of facts does not warrant a finding of guilty because the facts admitted do not show beyond a reasonable doubt that the statute in question was violated, must likewise fail. The admission by each defendant that he cohabited with the several named women, was in effect a plea of guilty; unless the fact that such cohabitation was because of defendant's religious belief in its righteousness made them constitutionally immune from prosecution therefor. It is inconceivable that the defendants supposed they were being criminally charged with dwelling in the same community with the named women; and that in making the admission referred to they merely admitted such fact. If any reasonable doubt be entertained as to the fact admitted, it would be dispelled by the reason given in the stipulation for so associating with the women. Such association was stated by each of appellants to have been based upon his belief in the Doctrine and Covenants of the Church "exclusive of the Manifesto." The "Manifesto," as hereinabove shown, was a declaration of the Church disapproving plural marriage. Defendants' admitted cohabitation then because of their disbelief in the declaration against plural marriage; and their belief in doctrines which, if such declaration were a nullity, would permit it. In asking this court to find a meaning of the stipulation other than that given it in the court below, appellants attribute to its membership a naivete, the possession of which we are unwilling to confirm.

We pass to a consideration of the argument that the prosecution and conviction of appellants was in violation

of the right of religious freedom guaranteed by the First and Fourteenth Amendments of the Constitution of the United States. It is now well settled that the freedoms of the First Amendment are among the fundamental personal rights protected by the Fourteenth Amendment from impairment by the States. *Murdock* v. *Commonwealth of Pennsylvania*, 319 U. S. 105, 63 S. Ct. 870, 87 L. Ed. 1292, 146 A. L. R. 82; *Douglas* v. *City of Jeannette*, 319 U. S. 157, 63 S. Ct. 877, 87 L. Ed. 1324; *Jamison* v. *State of Texas*, 318 U. S. 413, 63 S. Ct. 669, 87 L. Ed. 869; *Cantwell* v. *State of Connecticut*, 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A. L. R. 1352; *Schneider* v. *State of New Jersey, Town of Irvington*, 308 U. S. 147, 60 S. Ct. 146, 84 L. Ed. 155. If an act of Congress would be violative of the First Amendment the same legislation by a state would be in violation of the Fourteenth. The decisions of the United States Supreme Court as to whether a congressional act similar to that here considered contravenes the First Amendment is therefore authoritative.

In *Reynolds* v. *United States*, supra, in rejecting the same contention as that here made in a case involving conviction of polygamy, the United States Supreme Court said, 98 U. S. at pages 166, 167, 25 L. Ed. 244:

"In our opinion, the statute immediately under consideration is within the legislative power of Congress. It is constitutional and valid as prescribing a rule of action for all those residing in the Territories, and in places over which the United States have exclusive control. This being so, the only question which remains is, whether those who make polygamy a part of their religion are excepted from the operation of the statute. If they are, then those who do not make polygamy a part of their religious belief may be found guilty and punished, while those who do, must be acquitted and go free. This would be introducing a new element into criminal law. Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? * * *

"So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.

"A criminal intent is generally an element of crime, but every man is presumed to intend the necessary and legitimate consequences of what he knowingly does. Here the accused knew he had been once married, and that his first wife was living. He also knew that his second marriage was forbidden by law. * * * Ignorance of a fact may sometimes be taken as evidence of a want of criminal intent, but not ignorance of the law. The only defense of the accused in this case is his belief that the law ought not to have been enacted. It matters not that his belief was a part of his professed religion: it was still belief, and belief only.

"* * * But when the offense consists of a positive act which is knowingly done, it would be dangerous to hold that the offender might escape punishment because he religiously believed the law which he had broken ought never to have been made. No case, we believe, can be found that has gone so far."

As pointed out in the Cannon case, supra, the statute herein involved was enacted in furtherance of the effort to stamp out bigamy and polygamy. The reasoning of the Reynolds case is, therefore, here applicable. Nor can it be argued that the Reynolds case in reasoning or result has been in any way modified by later cases dealing with constitutional inhibitions against legislation hampering one in the free exercise of his religious belief. As late as 1942 in the case of *Murdock* v. *Pennsylvania,* supra, wherein the United States Supreme Court set aside the conviction of petitioner for violating an ordinance of the City of Jeannette, Pennsylvania, on the ground that such ordinance, as applied to the activities of petitioner, was invalid as violative of his rights under the Fourteenth Amendment, that court said [319 U. S. 105, 63 S. Ct. 873, 87 L. Ed. 1292, 146 A. L. R. 82]:

"* * * Nor do we have presented any question as to the sincerity of petitioners in their religious beliefs and practices, however misguided they may be thought to be. Moreover, we do not intimate

or suggest in respecting their sincerity that any conduct can be made a religious rite and by zeal of the practitioners swept into the First Amendment. *Reynolds* v. *United States,* 98 U. S. 145, 161, 167, 25 L. Ed. 244, and *Davis* v. *Beason,* 133 U. S. 333, 10 S. Ct. 299, 33 L. Ed. 637, denied any such claim to the practice of polygamy and bigamy. Other claims may well arise which deserve the same fate."

The assignments to the effect that the statute is violative of the United States Constitution are ■ without merit.

The contention of appellants that the Treaty of Guadalupe Hidalgo, or their rights thereunder, were violated by enactment and enforcement of the statute is wholly untenable. The guarantee of religious freedom in that treaty relates to Mexican citizens during the limited period ■ of time in which they could elect whether to remain Mexican citizens or become citizens of the United States. The Mormon pioneers who settled this region in 1847 before the treaty, were not Mexican citizens. They claimed to be American citizens and asserted rights as citizens of the United States. While on their westward trip, from among their numbers the Mormon Batallion was recruited in 1846 to fight against Mexico, and it participated in the conquest of this area. Certainly the Republic of Mexico had no interest in protecting the future interests of those who had aided in the conquest. Furthermore, the wording of the document is such as to leave no doubt that the purpose of the provision relied upon was to protect Mexican inhabitants of the territory until such time as they would come under the protection of the Constitution of the United States. Nor does it appear that any of the appellants were "Mexicans * * * within the territory aforesaid," in 1848. And clearly the treaty did not purport to deal with the relation between the United States and peoples who might thereafter come into territory then being ceded to this country. But all this aside, it is to be noted that Mexico at the time of entering into the treaty, prohibited plural marriage. That that country by protecting Mexicans in the

free exercise of their religion intended to protect the practice of polygamy, though based on religious belief, is, to speak frankly, absurd.

The third assignment, as the assignments are numbered at the outset, relating to lack of criminal intent is sufficiently answered in the quotation, supra, from the Reynolds case. For the reason therein expressed such assignment of error is overruled.

Appellants' next contention that the provision against polygamy was incorporated into our State Constitution through duress and coercion of Congress and that in consequence thereof such provision was void ab initio, is untenable. Generally, the consequences of duress are voidable only, not void. As a rule, in a transaction requiring mutual consent, if consent is obtained by coercion, the victim may either affirm or avoid the transaction, but he may not claim the benefits and escape the obligations. In view of the fact that the Constitution was ratified as a whole, if appellants were to argue their contention to its logical conclusion they would have to claim that because of alleged duress as to one provision, the ratification of the Constitution was invalid, and that the basis for obtaining statehood never occurred. However, they do not and cannot challenge the validity of ratification a half century after it transpired.

But assuming that the people of the state could, on the ground of coercion, avoid the "irrevocable ordinance" only;[1] that is the business of the people of the state and not of a faction or sect among them. And no attempt has been made to repeal the Constitutional provision forever prohibiting polygamy. Nor is such attempt likely. Furthermore, the mere repeal of such Constitutional provision would not preclude the legislature from making polygamy a crime. As stated in *Reynolds* v. *United States*, supra:

"* * * An exceptional colony of polygamists under an exceptional leadership may sometimes exist for a time without appearing

---

[1]That they might perhaps do so, see *Coyle* v. *Smith*, 221 U. S. 559, 31 S. Ct. 688, 55 L. Ed. 853.

to disturb the social condition of the people who surround it; but there cannot be a doubt that, unless restricted by some form of constitution, it is within the legitimate scope of the power of every civil government to determine whether polygamy or monogamy shall be the law of social life under its dominion."

The contention that the statute is special legislation is also without merit, for its provisions are applicable to all people in the State irrespective of race, color, social status, religious affiliation or non-affiliation. It is ■ a general statute and applies to all persons alike who violate its provisions. It is true that it relates to certain specific acts only, but the same is true as to statutes which penalize burglary and other species of crime.

The contention that by changing the offense from a misdemeanor to a felony the defendants are sub- ■ jected to cruel and unusual punishment is patently without merit.

Finally, it is contended that the statute under which they stand convicted is void because it violates Article VI, Sec. 23 of the Constitution of the State of Utah, which declares that "no bill shall be passed containing more than one subject, which shall be clearly expressed in its title." They argue that the statute actually contains four subjects, only two of which are expressed in the title. The Act, Chapter 112, Laws of Utah 1935, set out hereinabove as Sec. 103-51-2, U. C. A. 1943, was entitled:

"An Act Amending Section 103-51-2, Revised Statutes of Utah, 1933, Making Unlawful Cohabitation a Felony, and Providing that All Persons Except the Defendant Must Testify in Proceedings Therefor."

The contention that the act is void because there is in the body of the act subject matter which is not clearly expressed in the title must fail. If there are severable parts in an act one or more of which are not clearly expressed in the title, and where the act would be complete and capable of being enforced with such provision or provisions eliminated, only those parts are void

which are not so expressed in the title. *Riggins* v. *District Court,* 89 Utah 183, 51 P. 2d 645. Here the portion of the act making cohabitation a felony is clearly severable from the other provisions. No other part of the statute was invoked in the trial of these cases, hence appellants have no standing to question their validity.

On the other hand if two subjects, within the meaning of the Constitutional provision, are contained in the bill the legislation is invalid. *Elder* v. *Edwards,* 34 Utah 13, 95 P. 367. However, the contention that there is more than one subject in the act in question cannot be sustained. The decisions of this court announce the rule that the legislature may not include matters which are neither related nor germane to one subject; but that the constitutional provision is not to be applied so as to hamper the law-making power in adopting comprehensive measures covering a whole subject, where matters included all have some direct connection with or relation to the principal subject treated; and that the constitutional provision should be so applied as to guard against the real evil which it was intended to prevent. *Utah State Fair Ass'n* v. *Green,* 68 Utah 251, 249 P. 1016; *Elder* v. *Edwards,* supra; *Martineau* v. *Crabbe,* 46 Utah 327, 150 P. 301. See Crawford, Statutory Construction, Sec. 98, and Cooleys Constitutional Limitations, 6th Ed. p. 170, 171.

What is hereinabove said relative to the defendants having no standing to question the constitutionality of a severable though germane provision of an act where such provision was not invoked against them, answers a contention made in the briefs, but apparently abandoned during argument, that the act would compel a wife to testify against her husband contrary to the Constitution of the State of Utah. At the trial, neither the legal wife nor any purported wife of any defendant was called upon to testify.

We find no error in the record. The judgment of the trial court is, therefore, affirmed.

WOLFE, C. J., and LARSON, WADE, and TURNER, JJ., concur.