**Royston POTTER, Plaintiff,**

v.

**MURRAY CITY, a Municipal corporation, Calvin G. Gillen, individually and as Chief of Police of Murray City, Murray City Civil Service Commission, the Honorable Scott M. Matheson, Governor of the State of Utah, the Honorable David L. Wilkinson, in his capacity as Attorney General of the State of Utah, State of Utah and the United States of America, Defendants.**

No. C–83–0174C.

United States District Court,
D. Utah, C.D.

April 27, 1984.

Dennis V. Haslam and Donald J. Winder, Salt Lake City, Utah, for plaintiff Royston Potter.

Allan L. Larson and H. Craig Hall, Salt Lake City, Utah, for defendants Murray City, Calvin G. Gillen, and Murray City Civil Service Com'n.

Paul M. Tinker, Deputy Atty. Gen., Salt Lake City, Utah, for defendants Scott M. Matheson, Governor of the State of Utah, and David L. Wilkinson, Atty. Gen. of the State of Utah, and the State of Utah.

Brent D. Ward, U.S. Atty., Salt Lake City, Utah, and Drake Cutini, Dept. of Justice, Washington, D.C., for defendant The United States of America.

## MEMORANDUM DECISION ON MOTIONS

CHRISTENSEN, Senior District Judge.

### STATEMENT OF THE CASE

This case involves a civil rights claim for damages and declaratory and injunctive relief by a former police officer of Murray City who alleges that the termination of his employment because of his practice of plural marriage violated his right to the free exercise of his religion as protected by the First and Fourteenth Amendments to the Constitution of the United States, contrary to the provisions of 42 United States Code § 1983.

Monetary damages are sought against the City, its Chief of Police, and the Murray Civil Service Commission, and declaratory and injunctive relief is prayed for against the State of Utah and its Governor and Attorney General declaring Utah's laws against plural marriage void and enjoining their enforcement. Because of the claim that the enactment and retention of such laws were mandated by the federal Enabling Act as a condition for admission of Utah into the Union, the United States was joined as a party upon motion of the State.

This case is now before the court upon motions for summary judgment filed respectively by plaintiff, Murray City and the state defendants and a motion for judgment on the pleadings interposed by the United States. Following written briefing, and upon oral argument heard March 2, 1984, all pending motions have been submitted to the court for decision.

### FACTS

The third amended complaint of the plaintiff Royston E. Potter, in the light of which the motions before the court must be decided, succinctly states the basic fact structure in substance as follows:

On September 15, 1980, the plaintiff was employed by the defendant Murray City as a police officer and took an oath to support and defend the Constitution of the United States.

Plaintiff holds a genuine religious belief, faith and commitment in the principle and practice of plural marriage (polygamy).

At all times material to this case plaintiff has had two wives, both of whom have borne a child or children with plaintiff and for whom he provides love, care, support and maintenance.

The children born of these relationships are not neglected nor are they deprived. Plaintiff's wives, with full knowledge, have consented to plaintiff's plural marriage.

On or about December 1, 1982, plaintiff was terminated as a Murray City police officer by the defendant Gillen, Chief of Police of Murray City, at the direction of and with the full consent and knowledge of the defendant Murray City. This decision was affirmed by the defendant Civil Service Commission on February 18, 1983.

Defendants Gillen, Murray City and its Civil Service Commission terminated plaintiff's employment because of plaintiff's religious beliefs and practices and particularly by reason of his plural marriage or cohabitation and for his failure to support, obey and defend Article III, Section 1 of the Constitution of the State of Utah.

Aside from the contention of the defendants that there were other or additional reasons for the termination of plaintiff's employment as a police officer, there is substantial support in the record for the foregoing allegations. In reinforcement or supplementation of them, the parties have formally stipulated for the purposes of the presented motions the existence of the following facts:

On September 15, 1982, the plaintiff Royston E. Potter was actively practicing plural marriage.

The practice of plural marriage is the result of a good faith religious belief.

As of November 19, 1982, the plaintiff had two wives, both of whom have consented to this relationship.

The five children born of these relationships are not neglected or deprived.

On September 15, 1980, the plaintiff took an oath of office as a police officer wherein he agreed to support, obey and defend the Constitution of the State of Utah.[1]

There are between 5,000 and 10,000 individual family members of polygamist families currently residing in the State of Utah.

There have not been more than twenty-five criminal prosecutions for polygamy in the State of Utah since 1952.

Plaintiff's religious beliefs are totally immune from state scrutiny.

Plaintiff's wives and children receive adequate care, love and attention and want for no necessity of life.

The Appeals Referee, Appeal Section, Industrial Commission of Utah, Department of Employment Security, in the Matter of Royston Potter's Application for Unemployment Compensation Insurance found, among other things, that the performance of Royston E. Potter as a public officer was exemplary, that his practice of polygamy did not affect his performance as such officer, that the county attorney had refused to prosecute the claimant, that the claimant had initiated legal proceedings to challenge the constitutionality of Utah's antipolygamy law through the courts; that the Murray Police Department's right to discharge the claimant for the conduct in question was not an issue before the department but that "the issue in willful misconduct cases ... is whether the State is justified, under the circumstances, in denying benefits for such conduct."

It was concluded by the Commission that "[a]lthough the claimant's conduct may have justified his discharge, it is only disqualifying if it satisfies the three requirements set forth in ... the Utah Employment Security Act, [and that] the Appeals Referee is unable to make such a finding and it is, therefore, ruled the department correctly allowed benefits to the claimant."[2]

### ISSUES

While rulings upon all of the issues enumerated may not be essential, depending upon the disposition of some of them, they all have been considered in the arguments addressed to the court and have had to be explored to afford assurance of full consideration on the case. Moreover, it has been found helpful to an orderly presentation of the entire problem and of possible assistance in a better understanding from the beginning of the relationship of the various parties to it, to discuss all of the issues in the following order:

I. What are the presumptions, burdens of proof and breadth of inquiry in view of them?

II. Does the Eleventh Amendment bar this suit or the relief, if any, to be awarded,

---

1. As to state defendants the stipulation was, in form, that the foregoing facts were stipulated before the Murray City Civil Service Commission; but the court accepts them as established for the purposes of all of the motions for summary judgment here.

2. The parties stipulated in effect to the accuracy of the copy of the ruling attached to the stipulation and not expressly to the recited facts as such. *Cf. McDonald v. City of West Palm Beach*, — U.S. —, 104 S.Ct. 1799, 80 L.Ed.2d 302, (1984), rejecting any collateral estoppel effect of related but essentially different proceedings.

as against the State of Utah and/or its Governor and Attorney General?

III. Do the uncontroverted facts establish a qualified immunity from liability for monetary damages in favor of the defendant Chief of Police and the City's Civil Service Commission because of a good faith reliance upon the constitutionality of their action?

IV. Does Murray City share any such qualified immunity and, if not, could it be liable for monetary damages as well as declaratory or injunctive relief because the dismissal of plaintiff was the result of the policy, custom or usage of the City?

V. Was the United States properly made a party and, if so, with what consequences?

VI. Is Utah's present law against plural marriage any less the established policy of the State, or any less relevant or material to plaintiff's constitutional claims, because of the "compulsion" of the federal Enabling Act as a condition of Utah's statehood or the resulting "irrevocable" nature of Utah's prohibition of plural marriage pursuant thereto?

VII. Has there been a showing of a "compelling state interest" in the prohibition of plural marriage with no less restrictive alternatives consistent with that interest reasonably available to accommodate plaintiff's practice of polygamy?

VIII. Must any compelling state interest in the prohibition of polygamy yield to the plaintiff's religious belief or his right of privacy, equal protection or other fundamental right by reason of an appropriate balancing of such rights with the interest of the State?

IX. Is this case ripe for final disposition by summary judgment?

X. In conclusion, what should the order of the court be in disposing of the motions before it?

## ANALYSIS AND DISCUSSION

### I

It is well established that summary judgment may be granted only where there is no genuine issue of any material fact and the prevailing party is entitled to judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure. The party opposing such a motion is entitled to have all facts, including rational inferences, reasonably viewed in the light most favorable to that party. *Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373 (10th Cir.1980). Mere conclusions as distinguished from facts do not themselves authorize the approval or rejection of such motions. *Luckett v. Bethlehem Steel Corp., supra,* at 1380 n. 7; *Bruce v. Martin-Marietta Corp.,* 544 F.2d 442 (10th Cir.1976); *Stevens v. Barnard,* 512 F.2d 876 (10th Cir.1975). And the existence of questions of law which it is the court's duty to decide, however difficult, do not warrant the denial of a motion for summary judgment where the determinative facts are without dispute. *International Ass'n. of Machinists and Aerospace Workers, Dist. 776 v. Texas Steel Co.,* 538 F.2d 1116 (5th Cir.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977); *Spark v. Catholic University of America,* 510 F.2d 1277 (D.C.Cir.1975).

Freedom of religion of course is a fundamental, constitutional right. The plaintiff argues that a statute which impinges upon a fundamental right secured by the Constitution is "presumptively unconstitutional." On the other hand, the defendants assert that there is a presumption that laws prohibiting plural marriages are constitutional, having been sustained by the leading case of *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879). Plaintiff counters that the evolving mores and attitudes of society and the erosions of the *Reynolds* rationale by subsequent decisions of the Supreme Court have destroyed the precedential value of that case. The presumptions thus tend to neutralize each other and in that sense commend both an independent evaluation of plaintiff's constitutional claims based upon the latest pertinent decisions of the Supreme Court, and a reappraisal of

the rationale of *Reynolds* in contemporary context without being shunted in this process by supposed presumptions. So far as I can discover, there has been no such analysis in the cases of the basis of *Reynolds* to date.

Plaintiff asserts also that in view of changed conditions it is the burden of the defendants to demonstrate a "compelling state interest" in the prohibition of polygamy. For reasons hereafter to be developed, I believe that is so; but I do not agree that such interest must always be shown by empirical or testimonial evidence as distinguished from matters of precedent, principle, concept, history, legislative determination, or public policy of which the court may take judicial notice.

█ Nor does this case involve an issue of the validity of theological doctrine. The only significant point of doctrine has been set at rest by the stipulation of the parties that the plaintiff practices plural marriage as the result of a good-faith religious belief. One does not have to prove, and in the realm of theology or metaphysics cannot prove according to rules of evidence, the validity of his religious faith in order to have the protection of the First Amendment properly applied; nor do others need to disprove that validity to question the application of claimed First Amendment protections improperly invoked.

To fully accept the stipulation of the parties, one need not, indeed must not, be oblivious to the teaching of history that such a belief has been sincerely entertained and resolutely asserted by action before.[3]

Irrespective of whether others have deemed that their sincere religious belief had to yield to an interpretation of the Constitution, authoritative at that time, as a matter of compulsion or as an aspect of a broader religious conviction,[4] or whether a proper interpretation of the Constitution presently will accommodate plaintiff's practice and render it lawful, the duty of this court is the same—to seek that proper interpretation purely as a matter of constitutional law, but with sensitivity to the fact that plaintiff's religious practice is, in truth, one in which he sincerely believes.

█ It will be helpful in understanding the constitutional issues to have in mind at the outset general principles outlined in *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). Where a legislative classification works to the disadvantage of a constitutionally sensitive class—based, for example, on race, nationality, alienage or religious affiliation—the courts may uphold the classification only if it is precisely tailored to serve a compelling governmental interest. If the legislative classification impinges upon the exercise of a fundamental personal right, the classification must meet the same ex-

3. *See* Whitney, *Popular History of Utah*, 332–490 (1916); Neff, *History of Utah*, 555–563 (1940); Poll and Campbell, *Utah's History*, 283–293 (1978); Arrington and Bitton, *The Mormon Experience*, 178–205, 243–252 (1979).

4. *See* Thomas G. Alexander, "The Church and the Law," Dialogue (No. 2), 123, 128 (1966):

Some maintain that because Mormons were law abiding they gave up plural marriage after the Supreme Court declared the anti-polygamy acts constitutional (citing James E. Talmage A Study of the Articles of Faith: Being Consideration of the Principle Doctrines of the Church of Jesus Christ of Latter-Day Saints, 424–425 (1960)).

But long after the 1879 Reynolds decision, Church members brought to the bar for sentencing told federal judges that the law of God was higher than the law of the land and deserved prior obedience. The Manifesto officially ending polygamy as Church practice

was not issued until 1890, and excommunication for practicing plural marriage did not come until 1904....

As an historian, I see the problems of the 1870's and 1880's as a conflict of two systems of law, tradition, and morality, which, because they were mutually incompatible had to be reconciled in some way. As a devoted member of the Church, however, I see in the action of the federal government a manifestation of God's will. The Constitution, which the Church holds to be divinely inspired, demands the separation of church and state. The power exercised before 1890 to compel adherence to the Church's political and economical policies infringed upon that separation. The two principles, which were self-contradictory, could not both stand; and the Lord chose to have the Church abide by the Constitution.

acting "compelling interest" standard. If the legislative classification neither impinges on a fundamental personal right nor employs an inherently suspect classification, the courts will generally uphold the classification if it is rationally related to a legitimate state interest.

Here our analysis should not falter on the question of whether the employment of plaintiff as a police officer or even his claimed right in general to practice polygamy is a fundamental one. The fundamental right implicated by the facts and law of this case is the right to practice polygamy in pursuance of a sincere religious belief. As such, the defendants have the burden of showing that the infringement of it is warranted not merely by a rational justification but by a compelling state interest. *Cf. Wilson v. City of Littleton, Colorado,* 732 F.2d 765 (10th Cir.1984).

The issue in short, then, is whether it has been shown upon the basis of undisputed facts in the record or of which the court may take judicial notice that either plaintiff or any defendant as a matter of law is entitled to summary judgment, considering the burden upon the part of the defendants to demonstrate a compelling state interest supporting the dismissal of the plaintiff because of his practice of polygamy as a sincere religious belief.

It will be helpful to have before us immediately these provisions of law in pertinent part:

### Section 1983 of Title 42, U.S.C. (Civil Rights Act)

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

### First Amendment of the United States Constitution

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....

### Fourteenth Amendment of the United States Constitution

§ 1. All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

### An Act to Enable the People of Utah to Form a Constitution and State Government, and to be Admitted into the Union on an Equal Footing with the Original States 28 Stat. 107, Act of Congress of July 16, 1894

The Enabling Act instructed the Utah Constitutional Convention as a condition to Utah's admission into the Union to

... provide, by ordinance irrevocable without the consent of the United States and the people of said state:

First. That perfect toleration of religious sentiment shall be secured and that no inhabitant of said state shall ever be molested in person or property on account of his or her mode of religious worship: Provided, that polygamous or plural marriages are forever prohibited.

### The Constitution of Utah ARTICLE III

### ORDINANCE

The following ordinance shall be irrevocable without the consent of the United States and the people of this State: [Religious toleration—Polygamy forbidden.]

First. Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited.

*Utah Code Annotated, 1953* .

§ 76–7–101. Bigamy—Defense—Testimony.—(1) A person is guilty of bigamy, when knowing he has a husband or wife or knowing the other person has a husband or wife, he purports to marry another person or cohabits with another person.

(2) Bigamy is a felony of the third degree.

## II

■ The State of Utah contends that it is immune from suit in this case by virtue of the Eleventh Amendment which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." It is well established that this prohibition extends also to a suit against the state brought by one of its own citizens and that the provision cannot be circumvented by naming officers of the state as parties rather than the state as such.

Lengthy briefing has been devoted to the question whether injunctive relief as distinguished from monetary damages having direct impact upon the state treasury is permitted, a controversy in which salvo upon salvo of authorities have been fired. Neither side has been seriously injured nor has the court, it is to be hoped. Both sides are partly right, but it now appears that this makes little difference in the disposition of the case.

The latest decision of the Supreme Court on the subject, *Pennhurst State School & Hospital v. Halderman,* — U.S. —, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), reiterates with emphasis prior holdings that the principle of sovereign immunity under the Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest, regardless of whether the suit seeks damages or injunctive relief. But *Pennhurst* recognizes the continuing validity of the exception carved out in the landmark decision of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), enabling a federal court consistent with the Eleventh Amendment to enjoin state officials under certain conditions to conform their future conduct to the requisites of federal law even though such an injunction might have ancillary effect on the state treasury.

While the validity of Utah's prohibition of plural marriage is necessarily attacked by plaintiff in attempting to impeach his dismissal as a police officer and he has asked that the state be enjoined from enforcing that prohibition generally, it appears that he himself has not been prosecuted for any criminal violation and the State had no direct involvement with his discharge. Indeed, he complains in another connection that the prohibition is not now being enforced at all by the State through criminal prosecution. Thus, plaintiff's standing to seek injunctive relief against the State and its officers, apart from the issue of the validity of his discharge, seems questionable; the gist of his claim against the State pertains only to the matter of relief should the court determine the discharge to be unconstitutional. Irrespective of whether the latter point may be mooted, the continued presence of the State with its acquiescence,[5] besides providing a standby

5. During the State's oral argument on its motion to dismiss the following occurred:

Mr. Tinker (representing the State): With the two state officials now added as defendants in this case and given the federal case law on those kinds of issues, as I understand it, it is unimportant and I do not assert it at this point.

The Court: You waive your position to dismiss the State of Utah on the ground of the Eleventh Amendment?

possibility of recourse in some nonmonetary way, has contributed to the court's enlightenment on the constitutional issue.

## III

The individual Murray City officers contend that irrespective of the constitutional validity or invalidity of the state law as they applied it, they are not personally liable to plaintiff because they acted in good faith.

■■ A qualified immunity of executive officers, whom the law encourages to exercise their best judgment without fear of liability so long as they act in good faith, has long been recognized. Until recently it has been questionable whether this immunity is to be measured by a subjective standard of good faith or an objective one. If the question of good faith depended upon the subjective understanding or belief of an official involved, it might be difficult to resolve the issue of immunity on summary judgment. Motive or intent ordinarily is regarded as involving a question of fact. However, the Supreme Court resolved this problem as it bears upon the present case by holding that an objective standard applies. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In that case it was stated:

> We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [Citations omitted]

> Reliance on the objective reasonableness of an official's conduct, as measured by references to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.

■■ Upon the basis of this objective standard, I have no hesitancy in holding that the conduct of the city officers as pursued in good faith, did not violate clearly established statutory or constitutional rights of which a reasonable person would have known at the time of plaintiff's dismissal.

The landmark decision in the area of freedom of religion in connection with polygamy is *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1879), *supra*, in which the Supreme Court confirmed a conviction even though the defendant believed that the practice of polygamy was his religious duty and of divine origin and he had received permission from the authorities of his church to enter into the polygamist marriages.

The defendants assert that this case under the doctrine of *stare decisis* controls the disposition of the present case in their favor. The plaintiff contends that because of the erosion of its rationale by subsequent decisions of the Supreme Court and changing mores and attitudes in moder society, *Reynolds* need not be followed. It is upon the latter theory that plaintiff would have the court distinguish or overrule that case upon formal presentation of the issue, extensive investigation, pretrial proceedings, briefing, oral argument and study following such advisement.

But what the court might perceive in the culmination of that process to justify it in pursuance of its responsibility to decide the case is quite different from what defendants should have known as a basis for questioning the application of *Reynolds* and related decisions to their dismissal of plaintiff at the time this occurred.

Mr. Tinker: I still assert the motion to dismiss the State of Utah on the ground that it is not a person subject to section 1983 actions.

The Court: But actually, with the State present and the Eleventh Amendment matter being waived, your motion really is that relief be denied as against the State of Utah?

Mr. Tinker: Yes.

Within the presumed knowledge of the defendants as reasonable persons at the time of the plaintiff's dismissal, there was in existence not only a state law against polygamy but a state constitutional provision proscribing that practice pursuant to a federal statute. There was plaintiff's oath to support, obey and defend the Constitution and his known obligation to comply with the criminal law at least to the extent that it was valid. There was reasonable basis for belief that plaintiff was a felon in the light of that law. None of those provisions prohibiting polygamy had ever been held to be unconstitutional. On the contrary, a long line of decisions beginning with *Reynolds, supra,* had either expressly approved statutes forbidding the practice of plural marriage, or approved them impliedly or in principle, or cited *Reynolds* in other contexts as subsisting authority in the area of the free exercise clause of the First Amendment. *See, e.g., Miles v. United States,* 103 U.S. 304, 26 U.S. 481 (1881); *Cannon v. United States,* 116 U.S. 55, 6 S.Ct. 278, 29 L.Ed. 561 (1885); *Snow v. United States,* 118 U.S. 346, 6 S.Ct. 1059, 30 L.Ed. 207 (1886); *Davis v. Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890); *Late Corporation of Latter-Day Saints v. United States,* 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 478 (1890); *State v. Hendrickson,* 67 Utah 15, 245 P. 375 (1926); *Lovell v. City of Griffin,* 303 U.S. 444, 449, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *State v. Barlow,* 107 Utah 292, 153 P.2d 647 (1944), *appeal dismissed for want of substantial federal question,* 324 U.S. 829, 65 S.Ct. 916, 89 L.Ed. 1396 (1945), *reh'g. denied,* 324 U.S. 891, 65 S.Ct. 1026, 89 L.Ed. 1438 (1945); *Cleveland v. United States,* 146 F.2d 730 (10th Cir.1945); *State v. Musser,* 110 Utah 534, 175 P.2d 724 (1946); *Cleveland v. United States,* 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946); *In Re State in Interest of Black,* 3 Utah 2d 315, 283 P.2d 887 (1955); *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *United States v. Carroll,* 567 F.2d 955 (10th Cir.1977); *United States v. Ogle,* 613 F.2d 233 (10th Cir.1979); *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

At no time has *Reynolds* been overruled by the Supreme Court. The only comment called to my attention which intimates that it ultimately may be is to be found in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), *supra,* Justice Douglas dissenting at 247, 92 S.Ct. at 1549:

Action, which the Court deemed to be antisocial, could be punished even though it was grounded on deeply held and sincere religious convictions. What we do today, at least in this respect, opens the way to give organized religion a broader base than it has ever enjoyed; and it even promises that in time Reynolds will be overruled.

Reserving for later discussion the related question of whether this court should or can depart from the teachings of *Reynolds* in light of the contemporary setting, it is clear to me that persons in the position of Chief Gillen and the Civil Service Commission could not reasonably have known that Utah's laws against polygamy were unconstitutional and invalid at the time of plaintiff's dismissal.

In disposing of the question of immunity at this point, I am mindful that particularly upon the appellate level that decision is reserved until after the basic issue of an alleged constitutional violation has been addressed. *Martinez v. California,* 444 U.S. 277, 284, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980); *Dock v. Latimer,* 729 F.2d 1287 (10th Cir.1984). Yet, the answer to the question of immunity here is relatively clear and its consideration with that of some other related matters supplies a convenient starting point for discussing the legal impact of changing customs, attitudes and judicial concepts in light of which plaintiff claims that this court should hold that

plaintiff's constitutional rights have been violated, *Reynolds* notwithstanding.

## IV

The question of the immunity of the City itself also can be shortly answered to lend point to the discussion that follows. The City does not share the good faith immunity of its officers and would be liable to the plaintiff for damages if his constitutional right had been infringed by them. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

It is true that liability cannot be established upon the doctrine of *respondeat superior* itself, but only on the basis of conduct by its officers that is in execution of some policy, ordinance, regulation, decision or custom of the City itself. For the purposes of section 1983 police department policies can be said to be the policies of the City. *Van Ooteghem v. Gray*, 628 F.2d 488 (5th Cir.1980). Beyond this, the record before me leaves no room to question that the decision of the Chief of Police as affirmed by the Civil Service Commission to discharge plaintiff because of the violation of his oath and the law against polygamy carried out the official policy of Murray City.

## V

The United States was made a party to this suit upon the finding that its presence was necessary for a just adjudication and that it could properly be joined under Rule 19(a) of the Federal Rules of Civil Procedure, there being a challenge to the constitutionality of the federal Enabling Act, *supra*. More generally, it was the court's belief that even though the government might not be a necessary party in a strict sense, its presence was appropriate either to afford opportunity to be heard concerning its possible interest, or to renounce any such interest, or as an *amicus curiae*. Cf. *Associated General Contractors v. Laborers International Union*, 476 F.2d 1388 (Em.App.1973). *See also* 28 U.S.C. § 2403, concerning intervention of the United States in an action where the constitution-

ality of any act of Congress affecting the public interest is drawn into question.

The United States contends that it was improperly joined and that no case or controversy existed between it and the plaintiff. It further argues that any link between the Enabling Act and plaintiff's claim of unconstitutional discharge from employment is extremely remote, and that plaintiff's alleged fear of prosecution for polygamy is unreal because he has never yet been prosecuted and contends himself that Utah's law against polygamy is in "desuetude." Alternatively, it has moved for judgment on the ground that the prohibition of polygamist marriages infringes no constitutional interest of the plaintiff. Its final contention is that plaintiff has no constitutional right to practice plural marriage. While a reluctant party, the United States did not accept the invitation of the court, with a suit to quiet title analogy in mind, to disclaim interest in the litigation. In fact its counsel professed to have no view as to whether the Enabling Act continued to bind the State of Utah with respect to prohibiting the practice of polygamy.

Under the peculiar circumstances here, I believe that it was proper for the court thus to ascertain the substance—or in this one respect the opaqueness—of the Government's position before coming to a conclusion as to what, if any, bearing the federal Enabling Act has upon the "compelling state interest" issue central to this case.

## VI

In contending that the United States should be made a party, the state defendants argued that Utah's law can be directly traced to the action of the United States in passing the Enabling Act. Its counsel stated among other things:

Utah has not had occasion, because of the Federal Mandate reflected in [its] Constitution, to give public policy consideration to these particular issues. Utah has followed without question, as near as

I can determine, the mandate of the federal government to maintain this prohibition as a part of its price for statehood. Tr. of arg. on Motion to Dismiss Aug. 22, 1983, at 6.

Despite such argument, and the invitation it implies to extrapolate some weakening of the State's commitment to its own laws, I have concluded that the suggestion of "coercion" is beside the point. Utah was not thus made a second-class state whose laws have different legal or constitutional consequence than the similar laws of other states.

■■■ " '[T]his union' was and is a union of states, equal in power, dignity, and authority, each component to exert that residuum of sovereignty not delegated to the United States by the Constitution itself." *Coyle v. Smith*, 221 U.S. 559, 567, 31 S.Ct. 688, 690, 55 L.Ed. 853 (1911). *See also Baker v. Carr*, 369 U.S. 186, 226 n. 53, 82 S.Ct. 691, 714 n. 53, 7 L.Ed.2d 663 (1962). It is a fundamental rule of constitutional law that the sovereign power of a state "may not be constitutionally diminished, impaired or shorn away by any conditions, compacts, or stipulations embraced in the acts under which the new state came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission." *Coyle v. Smith, supra*, 221 U.S. at 573, 31 S.Ct. at 692. *Cf. State v. Barlow*, 107 Utah 292, 153 P.2d 647, 654 (1944).

■■■ The State of Utah, accordingly, has had full power since statehood to enact or amend in the manner provided by its own laws, any constitutional or statutory provisions dealing with the subject of marriage consistently with the Constitution of the United States as the supreme law of the land. The prohibition of polygamy as provided by its Constitution and laws, continues to be its settled public policy as does its commitment to monogamy as the cornerstone of its regulation of marriage, about which are clustered enumerable supportive laws passed by its legislature over the succeeding years.

■■■ The right to worship according to the dictates of one's own conscience and reason and to be free from molestation or restraint in his person, liberty, or estate in such worship, is a natural, fundamental and inalienable right, available to every individual, subject only to a proper exercise of the police power when action is coupled with belief. Freedom to believe or not to believe is absolute. Freedom to act, however, is not absolute but limited or qualified by the power of the state within reasonable limits to protect society pursuant to a compelling state interest. Particularly in the field of marriage and domestic relations has the State valid concerns with religiously motivated action to the extent of a compelling public interest.

The Constitution's protection of religious freedom derives most directly, of course, from the First Amendment. This amendment gains application to state and local governments through the Fourteenth Amendment's due process clause. That states and localities should be able to effectively exercise police powers to benefit their citizens is implicit throughout the Constitution and is explicit in the Tenth Amendment providing that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people."

These general propositions are firmly established and need no citation of authority as we proceed to define and apply the compelling state interest test bearing directly upon the issues in this case.

■■■ When a statute in exercise of the police power impinges upon fundamental rights, the court examining the statute must employ a strict scrutiny test requiring a compelling state interest and a showing that no less restrictive alternatives are reasonably available. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Espinosa v. Rusk*, 634 F.2d 477 (10th Cir.1980).

■ Murray City has contended that if any compelling interest test is to be applied it must be the compelling interest of the City in having its police officers comply with the criminal law and their oaths of office. This argument must be rejected as an over-simplification or begging of the question. To discharge an otherwise qualified and efficient officer because he forthrightly resisted an unconstitutional law would itself be unconstitutional. *Leonard v. City of Columbus,* 705 F.2d 1299 (11th Cir.1983). The controlling question is whether the law plaintiff violated as applied to him was constitutional.

Insufficient also in and of itself is the position of the State that there is a compelling state interest in prohibiting polygamy because of the many other adjustments that would have to be made in state laws to accommodate that practice. Such cases as *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), teach us that the bother of responding to constitutional mandates does not justify their disregard. Nor is the State's argument sound that there is no fundamental right to the practice of polygamy as such and therefore only the rationality standard is applicable. The fundamental right plaintiff relies upon is that of freely exercising his religion; there clearly must be a compelling state interest to warrant the impairment of that right. It is not sufficient to appraise the practice of polygamy separately on the basis of its conflict with law.

*Reynolds* may have suggested this latter approach.[6] But reserving for the present a consideration of what the controlling rationale of that decision really was, we proceed to the testing of its conclusion in the light of contemporary authority.

It has been said that states have an "absolute right to prescribe the conditions upon which marriage ... shall be created...." (*Zablocki v. Redhail,* 434 U.S. 374, 399, 98 S.Ct. 673, 688, 54 L.Ed.2d 618 (1978); Powell, J., concurring, quoting *Pennoyer v. Neff,* 95 U.S. 714, 734–35, 5 Otto 714, 734–35, 24 L.Ed. 565 (1878).) In exercising that right, the state "represent[s] the collective expression of moral aspirations" and there is "an undeniable interest in ensuring that its rules of domestic relations reflect the widely held values of its people." *Id.* (Powell, J., concurring). States have traditionally passed laws regulating marriage which include "laws on incest, bigamy, and homosexuality, as well as various preconditions to marriage such as blood tests." *Id.* As stated in *Maynard v. Hill,* 125 U.S. 190, 205, 8 S.Ct. 723, 726, 31 L.Ed. 654 (1888), "[m]arriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the Legislature."

The State of Utah beyond the declaration of policy and public interest implicit in the prohibition of polygamy under criminal sanction, has established a vast and convoluted network of other laws clearly establishing its compelling state interest in and commitment to a system of domestic relations based exclusively upon the practice of monogamy as opposed to plural marriage.

In attempted avoidance of this fundamental point, plaintiff has suggested "alternatives" by which he says his practice of polygamy might be accommodated to the fundamental interest of the State. He argues that "minor modifications" in these laws and those related to them, rather than the wholesale overhaul of the system apprehended by the State, would accomplish an appropriate balance. Individuals then, it is contended, "could freely exercise their religious beliefs without governmental in-

---

**6.** It was stated:

So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would make the professed doctrines of religious belief superior to the law of the land, and in effect permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.

terference and the interests of the State would be served without placing an undue burden on governmental functions." Plaintiff's basic solution would be the exemption of all persons with a sincere religious belief in polygamy from any prohibition of its practice.

The complications that would be encountered in the revision of the general legal system in adjustment to this "solution," the avoidance of which I have found not to be sufficient per se to establish a compelling state interest, at least suggest the sweep of the difficulties that would be encountered. But the real problems, practical, legal, conceptual, social and assuredly constitutional, would only start with these. *Cf. United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), *supra*.

 It would be the height of naivete to suppose that the lawful practice of polygamy thus could be limited to those of the plaintiff's faith, leaving aside the problem of the false assertion of religious motivation for physical gratification. The gate would be open by the developing trend of decision to everyone who might desire more than one wife at a time on the basis of his own particular religious belief. As James Madison said: "Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us." Quoted in *Everson v. Board of Educ.*, 330 U.S. 1, 66, 67 S.Ct. 504, 536, 91 L.Ed. 711 (1947). Under the free exercise clause, coercion in matters of worship, prayer and belief may be unconstitutional whether directed against the individual who merely refuses to worship "correctly" or against the individual who opposes the idea of worship altogether. *See* Merel, "The Protection of Individual Choice: A Consistent Understanding of Religion under the First Amendment," 45 U. of Chicago L.Rev. 805, 810 (1978).

The term "religion" is being given ever increasingly broad scope since the formulation of this definition in *Davis v. Beason*, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890):

The term "religion" has reverence to one's views of his relations to his Creator, and to the obligations they impose of reference for his being and character, and of obedience to his will. It is often confounded with the *cultus* or form of worship of a particular sect but is distinguishable from the latter.

In *United States v. Seeger*, 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733 (1965), which while dealing with a conscientious objector case may presage a constitutionally applied definition of infinitely broader scope, this formulation is suggested: "A sincere and meaningful belief which occupies in the life of the possessor a place parallel to that filled by the God of those admittedly qualifying for the exception...."

In view of these and other related developments, a commentator who has suggested that *Reynolds* should be critically reexamined has this "solution" for a seemingly insoluble problem:

A definitional approach to religion based solely on the individual's own characterization of his belief might appear to be judicially illimitable. An even less desirable alternative, though, is a formulation that would permit the Court to prescribe the parameters of religious faith. This dilemma may be resolved, and the meaning of "religion" minimally objectified, by testing a claimant's characterization of his beliefs against a traditionally accepted notion of religion as involving duties and obligations to conform to the standards of a unified belief system that cuts across and directs more than a single aspect of an individual's life.

*Merel, supra*, at 831, 842. Another commentator has suggested that "legalized polygamy may be one of the future shocks that will have to be faced in a rapidly changing society" because of the shift from shared values of the Nineteenth Century to subjectivization of values in the later part of the Twentieth Century and the

"[m]ore tolerant social attitudes toward homosexuality, adultery, obscenity, prostitution, and unusual marriage styles...." Dyer, "The Evolution of Social and Judicial Attitudes Towards Polygamy," 5 Utah Bar Journal, 35, 45 (Nos. 1–3, 1947). Concentration upon supposedly comparable practices suffered by modern society, if not approved, is beguiling; it misses the point of the compelling state interest in the prohibition of polygamy as opposed to monogamy which cannot be accommodated by mere regulation of the former.

There appear to the court to be no reasonable alternatives to the prohibition of the practice of polygamy to meet the compelling state interest found in the maintenance of the system of monogamy upon which its social order is now based. Any broad exception to that prohibition in cases of polygamy sincerely practiced as a "religious" belief would engulf the prohibition itself with ever extending and complicating exceptions based largely on subjective claims, irremediably eroding the police power of the state and its compelling interest. "[T]o maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good." *United States v. Lee, supra,* 455 U.S. at 259, 102 S.Ct. at 1056. While religious action as well as religious beliefs can often be accommodated, there is a point at which accommodation would radically restrict the operating latitude of the legislature. *Braunfeld v. Brown,* 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961).

## VIII

The compelling state interest that has been found may be enough, for if the interest is "compelling" it conceptually may subsume the right to prohibit religiously motivated action which is repugnant to that interest.

Yet, the plaintiff has suggested that apart from the free exercise clause of the First Amendment, or perhaps in connection with it, his right to privacy or some other fundamental right also must be considered and balanced against the City's right to discharge him for his practice of polygamy, without that practice being deemed inimical to his efficient service as a police officer.

In principle, the rejection of plaintiff's complaint for alleged interference with the "free exercise" of his religion should dispose of the case without reference to any less specifically protected right based upon the same practice. Plaintiff has disaffirmed any claim that he was denied the equal protection of the laws. While such authorities have been cited in the argument, it is clear that nothing in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) and *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), support the contention that his right to privacy has been invaded. Plaintiff does assert that his performance as a police officer was not adversely affected by his practice of polygamy and the City counters with the argument that only so long as that practice was not publicly known did it fail to have impact. But his practice is in essential nature a public one. And in essence his own position is that he has a right to engage openly in a polygamous relationship with the acceptance of society and particularly his superiors in the police force.

Plaintiff has not encountered his present difficulty simply by privately cohabitating with others. There was no right to privacy infringement detected in a statute authorizing a teacher to be fired for engaging in public homosexual activity, the court observing that the statute does not punish acts performed in private. "Thus the right to privacy, whatever its scope ... is not implicated." *National Gay Task Force v. Board of Education of the City of Oklahoma,* 729 F.2d 1270 (10th Cir.1984). It has long been held that the Utah statute prohibiting plural marriage or "cohabita-

tion" uses the word cohabitation not in a furtive or private sense, but as referring to the "living together as husband and wife." *State v. Barlow,* 107 Utah 292, 153 P.2d 647 (1944), *supra. Cf. Briggs v. North Muskegon Police Department,* 563 F.Supp. 585 (W.D.Mich.1983).

If, after the foregoing critical examination of the compelling state interest, there must be a further balancing of it with the impact of its advancement upon the situation of plaintiff and those in his position (*see e.g., Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972), *supra; Thomas v. Review Board of Ind. Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) and *Grosz v. City of Miami Beach, Florida,* 721 F.2d 729 (11th Cir.1983)), the conclusion would not be altered.

Putting into the scale the nature of the conduct for which plaintiff was dismissed, apart from his insufficient defense of that conduct, the position of the defendants is not weakened.

It is suggested in *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), that in some instances the conduct of police officers can be more severely restricted than that of private individuals. The plaintiff violated his oath to support the Constitution and laws of the State of Utah. He held himself out in the defendants' reasonable viewpoint as a felon and emphasized this by his insistence upon publicly continuing his practice as of right. To say under such circumstances that this did not affect his value and performance as a police officer would be unrealistic.

The determination by the State Department of Unemployment Security that plaintiff's practice of polygamy did not justify the denial of unemployment compensation is of little significance here in view of the different question involved and the express rejection by the State Supreme Court in a later case of the agency's rationale that the violation of the law and his oath which may have sufficiently authorized a police officer's discharge did not so bear upon the performance of his duty as to disqualify him for unemployment compensation as well. *Clearfield City v. Department of Employment Security,* 663 P.2d 440 (Utah 1983).

As in *United States v. Lee, supra,* a religion based exception to the challenged law would be too costly. Without such exception the burden on religion would be infinitely less. The very nature of the religious practice involved, never viewed by the courts thus far as innocuous, much less laudible, weighs at most only slightly as compared with the State's firm and intricately implemented commitment to the system of monogamy.

I have largely ignored in this analysis the holding of *Reynolds* and its basic teaching, being persuaded that I should take a fresh look at the problem from the viewpoint of the more current authority and in the light of present societal conditions and attitudes. Yet, my analysis with due consideration for balance cannot properly be closed without reverting to that decision. It still remains the decision of the highest court of the land and even though it were not observed for its authority it must be considered for its reasoning to the extent persuasive and not inconsistent with later rulings of the Supreme Court. Disregarding its suggestion that polygamy should be barred as subversive to good order for the same reason that human sacrifice and Suteeism would, its oversimplification of a proper belief/action analysis of First Amendment problems (*cf., e.g., Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972)), and its seeming insensitivity in passing moral judgment on the sincerity of religious belief, there yet remains in *Reynolds* a sound basis for the modern compelling interest analysis found to be controlling in the present case.

The gist of the holding in *Reynolds* is supported by this reasoning that continues to be a good law:

> In the face of all this evidence, it is impossible to believe that the constitu-

tional guaranty of religious freedom was intended to prohibit legislation in respect to this most important feature of social life. Marriage, while from its very nature, a sacred obligation, is, nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal....

[T]here cannot be a doubt that, unless restricted by some form of constitution, it is within the legitimate scope of the power of every civil government to determine whether polygamy or monogamy shall be the law of social life under its dominion.

## IX

While plaintiff contends that this case is ripe for summary judgment in his favor, he asserts that in any event the defendants' motions for summary judgment cannot properly be granted because to do so would require a finding of additional facts that can be established only upon trial. The "facts" involved in this argument, plaintiff's counsel explained at the oral argument without specifically defining them, relate to the question of a compelling state interest. A notion of their nature may be gathered from some of plaintiff's unsuccessful demands for admissions during pretrial discovery.[7]

I am of the opinion that proof negating such claimed facts or establishing any other material matter of which the court cannot take judicial notice would be neither

practical, helpful nor necessary for the final disposition of this case.

It may be that in some instances the exploration through evidence of the bases of societal judgment would encourage more informed or careful decision making. But it has been well pointed out that when no empirical research may exist or lend itself to the establishment of legislative facts, or there may be substantial barriers to conducting competent research on a particular question, a conclusion based upon an empirical assumption that might imperfectly result is far less justified than an approach to a decision which turns upon the intrinsic worth of values and principles. Shuman, "Decisionmaking under Conditions of Uncertainty," 67 Judicature No. 7 (February 1984), 826. *See also* Fed.R.Evid. 201(a); Davis, "An Approach to Problems on Evidence in the Administrative Process," 55 Har.L.Rev. 364, 402–416 (1942). In any event, I have concluded that the question of a compelling public interest in this case is one of law to be determined by the court.

## X

In summary, I conclude:

1. The defendants are entitled on the uncontroverted record to summary judgment of "no cause of action" on plaintiff's claims.

(a) As to the State defendants, plaintiff has established neither that state law against polygamy nor his dismissal as a police officer violated his constitutional rights, and in any event the State defendants have established their immunity from liability to the plaintiff pursuant to

---

**7.** That the people of Murray City, the State of Utah, and the United States have not been harmed as a result of the practice of plural marriage for religious reasons; there is no empirical data showing that the members of a polygamist family are more likely to require social welfare than members of a monogamous family in the same geographical locations or that members of a polygamist family are more likely to suffer physical or mental problems; that there is no empirical data showing that members of a polygamist family receive less love or attention than do members of a monogamous family in the same geographical location

or evidencing harm to American society that has resulted from the practice of plural marriage; that the high rate of divorce in the United States has often turned today's American familial relationships into a form of serial polygamy; that polygamy is a morally acceptable lifestyle in many cultures of the world; that moral attitudes opposing polygamy in the western Judeo-Christian culture are the direct results of the religious attitudes of the Holy Roman Empire; and that Murray City and the State of Utah have no compelling interest in prohibiting cohabitation relationships between consenting adults when done for religious purposes.

the Eleventh Amendment to the Constitution of the United States.

(b) As to the defendant Chief of Police and the Civil Service Commission plaintiff has failed to establish that his dismissal as a police officer violated any constitutional right, and those defendants established immunity from monetary liability by reason of their good-faith reliance upon the constitutionality of state law.

(c) As to the defendant Murray City, while no good faith immunity exists in its favor under current law, plaintiff has failed to establish that his dismissal as a police officer violated any constitutional right.

(d) As to the defendant United States, plaintiff has failed to establish its violation of any constitutional right of plaintiff.

2. Plaintiff's practice of polygamy is not protected by the First Amendment guaranteeing the free exercise of religion insofar as concerns the validity of his dismissal from the Murray City Police Force.

3. The practice of polygamy by plaintiff is not a fundamental right constitutionally protected by the Free Exercise Clause of the First Amendment or any right of privacy or liberty under the Fourteenth Amendment, or at all, as against the state Constitution and law prohibiting plural marriage and the compelling state interest supporting them.

4. Plaintiff did not have a constitutional right to retain his employment under the circumstances of this case and whatever rights he may otherwise enjoy, his right to employment as a police officer must yield to the compelling state interest in prohibiting polygamy and to the right of Murray City to require its police officers to conform their conduct to state criminal laws according to their oaths.

5. Summary judgment should be entered in harmony with these conclusions.

Counsel for the defendants shall submit to the court within ten days a proposed judgment after submission to opposing counsel in an effort to agree on its form. Any such agreement will not be deemed a waiver in any respect of the substantive positions of the parties. Objection if any to defendants' proposed form to the extent it cannot be resolved by agreement shall be filed within two weeks, and will be heard, and the form of judgment settled before the court, on May 15, 1984, at the hour of 10:00 o'clock a.m.